# In the United States Court of Federal Claims

No. 18-916C
(Filed: February 21, 2020)

<table>
<tr><td>

CAPITOL INDEMNITY
CORPORATION,

               Plaintiff,

v.

THE UNITED STATES,

               Defendant.

</td><td>

Motion To Dismiss; RCFC 12(b)(6);
Failure to State a Claim; Contract
Disputes Act; Equitable Subrogation;
Takeover Contract; Materials Outside the
Complaint

</td></tr>
</table>

*Ian Michael McLin*, San Antonio, TX, for plaintiff.

*Daniel K. Greene,* Civil Division, United States Department of Justice, Washington, D.C., with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirshman, Jr.*, Director, and *Deborah A. Bynum*, Assistant Director, for defendant. *Major Adrian Allison*, Washington, D.C., of counsel.

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

**FIRESTONE**, *Senior Judge*.

Pending before the court is the United States' ("government" or "defendant") motion to dismiss Capitol Indemnity Corporation's ("Capitol") claims for damages in connection with performance and payment bonds Capitol issued to Redstick, Incorporated ("Redstick") under the Miller Act, 40 U.S.C. § 3131. On September 27, 2014, the United States Army (the "Army") awarded a contract to Redstick ("Contract") to renovate a fitness facility at Fort Hood in Texas. After the government terminated Redstick's Contract for default on March 28, 2016, Capitol completed the work

remaining on the renovation pursuant to a Takeover Agreement. In this action, Capitol is seeking damages from the government for claims arising in connection with Capitol having to fulfill its obligations under the performance and the payment bonds issued to Redstick. First, under the doctrine of equitable subrogation, Capitol claims it is entitled to $461,585.70 on the grounds that the Army improperly released progress payments to Redstick in contravention to the FAR 52.232-16.[1] Second, also under the theory of equitable subrogation, Capitol claims that it is entitled to an equitable adjustment of $135,065.69 under FAR 252.243-7002(a),[2] in connection with work Capitol performed reinstalling a gym floor at the Fort Hood fitness facility. Third, Capitol is seeking $94,847.10, as Redstick's assignee, under the Contract Disputes Act ("CDA") for additional work Redstick performed on the heating, ventilating, and air conditioning ("HVAC") system at the fitness facility and which Capitol argues the Army owed but did not pay to Redstick.

---

[1] Under FAR 52.232-16(a) the government is required in certain circumstances to retain at least 20% of the total amount of progress payments made to a contractor.  FAR 52.232-16(a) provides in relevant part that, "The total amount of progress payments shall not exceed 80 percent of the total contract price."  FAR 52.232-16(c) goes on to provide that even more than 20% can be retained under specified conditions. Specifically, the "[CO] may reduce or suspend progress payments . . . after finding on substantial evidence any of the following conditions . . . [p]erformance of this contract is endangered by the Contractor's (i) [f]ailure to make progress; or (ii) [u]nsatisfactory financial condition" or "[t]he Contractor is delinquent in payment of the costs of performing this contract in the ordinary course of business." *Id.*

[2] FAR 252.243-7002(a) states: "The amount of any request for equitable adjustment to contract terms shall accurately reflect the contract adjustment for which the Contractor believes the Government is liable. The request shall include only costs for performing the change, and shall not include any costs that already have been reimbursed or that have been separately claimed. All indirect costs included in the request shall be properly allocable to the change in accordance with applicable acquisition regulations."

The government has moved to dismiss Capitol's entire complaint under Rules 12(b)(1) and 12(b)(6) of the Rule of the United States Court of Federal Claims ("RCFC").

For the reasons that follow, the government's motion to dismiss (ECF No. 7) is **GRANTED IN PART AND DENIED IN PART**.

## I.      FACTUAL BACKGROUND

The following facts are taken from Capitol's amended complaint (ECF No. 23) and exhibits attached to the complaint. *See* RCFC 10(c) (providing that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes"); *Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1325 (Fed. Cir. 2016) (permitting the court to consider the allegations and exhibits  "incorporated into the complaint by reference") (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

### A.      Contract Award, the Bond Agreements, and Payments to Redstick

Redstick was awarded fixed price contract number W91151-14-C-0061 on September 27, 2014 for the renovation of the Iron Horse Gym Building at Fort Hood. Am. Compl. ¶ 4 (ECF No. 23). Under the terms of the Contract, Redstick was required to complete the renovation by September 30, 2015. *Id.* ¶¶ 13, 15. After various amendments, the total contract price was raised to $2,307,898.53. *Id.* ¶ 8; *id.* at Ex. B (ECF No. 23-2).

Under the terms of the Contract, Redstick was required to "provide executable performance and payment bonds within the timeframe specified in the contract." *Id.* Ex.

B at 45. Redstick sought and Capitol, as surety, issued a Performance Bond and Payment Bond (collectively, the "Bonds") on October 2, 2014. *Id.* at ¶ 6.[3] The Army approved of the Bonds. *Id.* at ¶ 7.

Over the course of Redstick's performance, the Army made nine progress payments to Redstick totaling 90% of the contract price. *Id.* at ¶ 18; i*d.* Ex. D at 16 (ECF No. 23-4). The Contract included three provisions regarding progress payments. First, the Contract's text included FAR 52.232-16. *Id.* Ex. B at 25-26; *see supra* note 1. Second, the Contract contained a provision titled "ELIGIBILITY FOR PAYMENT/CONSTRUCTION CONTRACT PROGRESS PAYMENT REQUESTS," Am. Compl. Ex. B at 48, which states in relevant part that "[n]o progress payments are authorized above 80% of the contract value." *Id.* Ex. B at 49.

Third, the Contract incorporated by reference FAR 52.232-5. *Id.* Ex. B at 12. FAR 52.232-5 provides in relevant part: "The Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the [CO], on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the [CO]" and "if satisfactory progress has not been

---

[3] Prior to the award of its contract with the Army, Redstick, on September 12, 2014, executed a General Indemnity Agreement with Capitol. Am. Compl. ¶ 6. In the agreement, Redstick agreed to assign Capitol its rights "to all monies due or to become due . . . under any contract(s) covered by such Bonds" to be effective where "[Capitol], at its option, shall notify" the obligee that the assignment is in force. *Id.* ¶ 6; *Id.* Ex. C at 2. When the assignment is in effect, Capitol had "power of attorney to endorse in their name(s) as the payee(s), and to collect any checks, drafts, warrants, or other instruments made or issued in payment of any such sums and to disburse the proceeds thereof." *Id.*

made, the [Contracting Officer ("CO")] may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved."

Capitol alleges that a government representative "contacted Capitol on September 24, 2015 to advise [Capitol] of Redstick's default" and stated "[Redstick] is currently 25% behind schedule. Today is the last day of the Period of Performance (POP) for this contract. There are issues other issues [sic] with this [C]ontract that we are trying to work thru[sic]. . . ." Am. Compl. ¶ 22.

Capitol alleges based on this September 24, 2015 communication from the Army that the Army understood as of September 24, 2015 that Redstick was in "default" and that Capitol's surety duties would soon be triggered under the Bonds. *Id.* ¶ 22. Capitol alleges that the Army later acknowledged this communication in an April 7, 2016 email. *See id.* ¶ 24.

On September 29, 2015, the Army "sent correspondence" to Redstick identifying numerous deficiencies in Redstick's contract performance. *Id.* ¶ 23.[4] On October 21, 2015, the government sent Redstick a "Cure Notice" in which the Army scheduled an inspection and demanded that Redstick provide the Army with a remedial plan. *Id.* ¶ 25. Redstick failed to provide a remedial plan to the Army. *Id.* On October 30, 2015, the Army issued to Redstick an "official Letter of Concern" due to "the numerous deficiencies and non-conforming work." *Id.* at ¶ 26.

---

[4] The deficiencies included failing to meet deadlines, remove and level the floors, deliver or install the rubber mats, finish the interiors, complete the latrines, install all the ceilings, and complete the hallway tiling. *Id.*

On November 25, 2015 and December 1, 2015, the Army again wrote to Redstick and referenced the provision in the Contract prohibiting the Army from paying Redstick more than 80% of the Contract's funds through progress payments. *Id.* ¶ 11.

On December 30, 2015, the Army "communicated to Capitol" that Redstick's work on the Contract was not complete and that Capitol should be receiving Payment Bond claims from Redstick's unpaid subcontractors. *Id.* ¶ 28.[5] On January 4, 2016, the Army suspended Redstick's Contract and copied Capitol. *Id*. ¶ 29.

Despite these communications, Capitol alleges that the Army, contrary to the terms of the Contract, continued to issue progress payments to Redstick in the amounts claimed. These payments included the ninth progress payment paid to Redstick after Redstick had been suspended on January 4, 2016, *id.* ¶ 20, and after Capitol asked the Army to issue joint checks to Redstick and the subcontractors on January 13, 2016 which the Army refused, *id.* at ¶ 31; *id.* Ex. E at 2 (ECF No. 23-5). The ninth progress payment appears to have been made on January 29, 2016. *Id*. Ex. C at 6 (ECF No. 23-3). On March 28, 2016, the Army issued a letter declaring Redstick to be in default. *Id*. ¶ 37.

## B.    Capitol's Equitable Subrogation Claims for Wrongful Payment

Capitol alleges that it is entitled to $461,585.70, or the amount the Capitol alleges the Army wrongfully paid Redstick after the Army knew of Redstick's "default" in September 2015. *See* Am. Compl. ¶ 29 and Oral Arg. 14:26:35-14:27:55. In the alternative, Capitol claims it is entitled to damages equal to the amount paid by the Army

---

[5] Capitol eventually received Payment Bond Claims from seven subcontractors totaling to $736,793.19. Am. Compl. ¶ 35.

to Redstick after Redstick was suspended on January 4, 2016. Am. Compl. ¶ 29. Capitol argues that the Army's knowledge of Redstick's default triggered Capitol's rights as the surety and that progress payments made to Redstick after its "default," should have been retained for Capitol to complete the work and pay subcontractors. *Id.* at ¶¶ 29-31.

### C.    **Capitol's Claim for Replacing the Gym Floor**

Redstick's renovation Contract called for the removal of the existing hardwood gym floor and the installation of rubber matting over the exposed concrete. Am. Compl. ¶ 61. Capitol alleges that the Army accepted and paid for Redstick's work on the gym floor. *Id.* at ¶ 32.[6] In such circumstance, Capitol alleges the Army's subsequent insistence that Capitol redo the gym floor on May 4, 2016 amounted to a contract change and that Capitol is entitled to be paid for the additional gym floor work. *Id.* at ¶ 62.

As relevant to this claim, the Takeover Agreement, effective May 13, 2016, states that Capitol "undertakes to cause the performance of the Work, including correcting patent defects, a list of which is set forth in Exhibit 'A' of this Agreement, and any latent defects in the work performed by [Redstick] to be completed in accordance with each and every one of the terms, covenants and conditions of the [Redstick] Contract." *Id*. Ex. A at 1. The Takeover Agreement also states that "the Surety does not agree that any of the items on Exhibit 'A' constitute patent defects and shall have the right to have items removed from the list that it demonstrates are not patent defects, by mutual consent of the parties to this Agreement." *Id.* Further, Exhibit A states "[f]loor surface below rubber

---

[6] It is unclear which progress payment covered this gym floor work, and, if the ninth progress payment covered the gym floor work, whether Capitol can recover for both its FAR 52.232-16 and FAR 252.243-7002(a) claims under the theory of equitable subrogation.

flooring will be floated to ensure a flat, smooth look. Remove rubber flooring, float floor, and re-install rubber flooring." *Id.* Ex. E at 6.

### D.    Capitol's Claim for HVAC Work

Capitol claims that while Redstick was performing the Contract with the Army, the Army's Contracting Officer Representative ("COR") directed Redstick's subcontractors to perform certain work outside the scope of the Contract in connection with fixing the HVAC system. Am. Compl. ¶¶ 63-68. The subcontractors were "advised that no request for information would be permitted and that if utilized or the additional work was not performed, liquidated damages would be assessed." *Id.* at ¶ 65. Capitol alleges that the Army told Redstick's subcontractors that Redstick would be able to seek funding for this extra work from the United States. *Id.* Ex. D at 12; *see id.* ¶ 68 (incorporating Ex. D).

After Redstick's termination, Capitol and the Army negotiated the terms of Capitol's Takeover Agreement to complete the work pursuant to Capitol's Performance Bond. Am. Compl. ¶¶ 37-39. In its negotiations over the Takeover Agreement, Capitol alleges it specifically reserved all rights arising under Redstick's contract. *Id.* at ¶ 38. Capitol advised the Army that Capitol sought to "reserve any rights" in an email and the Army responded, "Got It!" on April 21, 2016. *Id.* at ¶ 39. Capitol alleges that this reservation of rights includes the amount that was owed to the HVAC subcontractor for work it was required to perform outside the scope of Redstick's contract. *See id.* at ¶¶ 38-40, 64-65.

### E.   The Takeover Agreement

In the Takeover Agreement, Capitol agreed to complete certain work in exchange for the $230,792.85 balance remaining on Redstick's contract and for the reservation of Redstick's rights under the original contract and Capitol's own equitable subrogation rights. Specifically, Paragraph 13 of the Takeover Agreement states:

> Surety [CAPITOL] expressly reserves all prior rights, equitable liens and subrogation rights under the contract [Contract], performance bond, payment bond, at law or in equity, as well as the Surety's own rights dating back to the execution of the bond, to include, but not be limited to, those rights and remedies that accrued prior to the former Contractor's [Redstick] termination, Contractor's default, and those rights and remedies that may accrue during the completion of the contract, including any and all claims of overpayment and/or payments in violation of the terms of the Contract to the Contractor arising under the subject Contract.  No waiver of such rights is agreed to or implied, regardless of any provisions of this Agreement to the contrary and Owner acknowledges Contractor's assignment of such claims and causes of action to Surety.

> To the extent necessary, if Surety elects to pursue any claims of former contractor arising under the contract in its own name and for its own benefit, Owner hereby acknowledges and consent [sic] to the assignment of all former contractor's claims to Surety under the contract, to the extent permitted by law, including but not limited to, the right of Surety to assert, in its own name and for its own benefit, all of former Contractor's and any of Contractor's subcontractor's claims for equitable adjustment to the Contract Price or time under the subject Contract, whether arising prior to or after the default.

*See* Amend. Comp. ¶ 41; *id.* Ex. A at 5.

## II.   PROCEDURAL HISTORY

Capitol submitted three claims to the CO on March 22, 2017 and the CO denied those claims on July 24, 2017. Am. Compl. Ex. D at 1; *id.* Ex. E. Capitol filed its initial complaint on June 26, 2018. The government filed an initial motion to dismiss Capitol's case on October 26, 2018. (ECF No. 7). After a status conference, Capitol submitted a

first amended complaint containing the above-described allegations. (ECF No. 23). The

government thereafter renewed its motion to dismiss Capitol's complaint (ECF No. 24).

The court held oral argument on the government's renewed motion to dismiss on January

15, 2020. Following oral argument, the court requested supplemental briefing on the

issue of whether certain of the government's arguments were properly raised under

RCFC 12(b)(1) or should be considered under RCFC 12(b)(6). The supplemental briefing

was completed on January 24, 2020 (ECF Nos. 34-35).

## III.    STANDARD OF REVIEW

### A.    Subject Matter Jurisdiction under RCFC 12(b)(1)

In deciding a motion to dismiss for lack of subject matter jurisdiction, the court

must "accept as true all undisputed facts asserted in the plaintiff's complaint and draw all

reasonable inferences in favor of the plaintiff." *LaBatte v. United States*, 899 F.3d 1373,

1375 (Fed. Cir. 2018) (quoting *Trusted Integration, Inc. v. United States*, 659 F.3d 1159,

1163 (Fed. Cir. 2011)). The plaintiff "bear[s] the burden of establishing that the court has

jurisdiction by a preponderance of the evidence." *Diversified Group Inc. v. United States*,

841 F.3d 975, 980 (Fed. Cir. 2016). "In determining jurisdiction, a court must accept as

true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable

inferences in favor of the plaintiff." *Id.* (quoting *Trusted Integration*, 659 F.3d at 1163).

"While the court may look beyond the pleadings in resolving issues relating to

subject matter jurisdiction, when issues of fact are central to both jurisdiction and the

merits of the claim, the trial court should assert jurisdiction for the purpose of

establishing relevant facts and dispose of all aspects of the case through trial." *U.S. Fire Ins. Co. v. United States*, 78 Fed. Cl. 308, 324 (2007).

**B.    Failure to State a Claim under RCFC 12(b)(6)**

When addressing a motion to dismiss pursuant to RCFC 12(b)(6), the court must determine whether, based solely on the pleadings, "a claim has been stated adequately." *Brocade Commc'n Sys. v. United States*, 120 Fed. Cl. 73, 78 (2015) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007)). A claim should survive a RCFC 12(b)(6) motion only if the plaintiff's "factual allegations [are] substantial enough to raise the right to relief 'above the speculative level.'" *Id.* at 78 (quoting *Bell Atl. Corp.*, 550 U.S. at 555). In determining whether a plaintiff has adequately stated a claim, the court must accept as true all factual allegations in the complaint and must make all reasonable inferences in favor of the plaintiff. *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555-56); *see Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007). However, the court need not accept legal conclusions in the complaint. *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014).

**IV.   DISCUSSION**

**A.    Claims Based on the Army's Payment of More Than 80% of the Contract Price to Redstick and the Failure to Suspend Payments after Redstick's Failure to Meet Contract Deadlines**

When Capitol assumed Redstick's obligations under the Takeover Agreement, the Army had already paid Redstick 90% of the contract price leaving only 10% of the Contract's funds or $230,792.85 available to Capitol for finishing the remaining contract work.  Capitol has completed its obligations under the Takeover Agreement and has

received those remaining funds from the Army. In this action, Capitol seeks (1) an additional $230,792.85 on the ground that the Army violated the FAR 52.232-16(a) when it made progress payments to Redstick in excess of 80% of the contract price in contravention of FAR 52.232-16(a) and (2) an additional $230,792.85 on the ground that the Army abused its discretion by failing to suspend progress payments under FAR 52.232-16(c) after Redstick failed to meet the contract's deadlines. Oral Arg. 14:26:35-14:27:55. Capitol argues that both of these claims arose after Capitol was equitably subrogated to Redstick's rights under the contract.

In its motion to dismiss, the government argues that Capitol's claim under FAR 52.232-16(a) should be dismissed for lack of jurisdiction on the grounds that it was not raised before the CO as required for claims brought under the CDA. Def.'s Supp. Reply at 4-5 (ECF No. 26). The government also argues that Capitol's claims for payments under FAR 52.232-16 fail as a matter of law because Capitol's equitable subrogation rights were not triggered until after Redstick was "terminated" for default in March 2016 and the Army did not make any payments to Redstick after Redstick was terminated. Def.'s Supp. Mot. at 12-15 (ECF No. 24).

Turning first to the question of jurisdiction, the court finds that because Capitol was not required to raise its equitable subrogation claim based on FAR 52.232-16(a) before the CO, the court has jurisdiction to hear Capitol's claim under that FAR provision. Equitable subrogation claims are brought under this court's original jurisdiction under 28 U.S.C. § 1491(a)(1) and thus the claim did not have to be raised as a CDA claim before the CO. *See Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1369

(Fed. Cir. 2001) ("[A] subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1491, and bring suit against the United States."); *see also Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136 n.12 (1962) (equitable subrogation "is independent of any contractual relations between the parties") (quotation and citation omitted).

In addition, even if Capitol's equitable subrogation claim under FAR 52.232-16(a) needed to be raised before the CO under the CDA, the court finds that the claim was effectively raised before the CO when Capitol made a claim for wrongful payments to Redstick under the same FAR provision, although under a different subsection. In this court, Capitol claims that the Army should have known that Capitol's subrogation rights were triggered once Redstick had failed to meet the contract deadline in September 2015 and that funds should have been reserved for the surety after that date. Before the CO, Capitol further alleged that payments should have been withheld because the Army was aware of Redstick's failure to pay subcontractors. The court views the two arguments as involving the same remedies, the same FAR provision, and the same progress payments. *See K-Con Bldg. Sys. Inc. v. United States*, 778 F.3d 1000, 1004-5 (Fed. Cir. 2015) (stating that the CDA's requirement to raise claims to the CO in the first instance has not been "so rigid a standards as to preclude all litigation adjustments in amount based upon matters developed in litigation" and that "merely adding factual details or legal argumentation does not create a different claim") (internal quotation and citation omitted). The CO was thus on notice of the rationale of Capitol's claim and determined that in all instances Capitol's rights were not triggered before March 2016 and even

addressed Capitol's January 13, 2016 request for the issuance of joint checks. In such circumstance, the notice requirement was satisfied.

Having concluded that the court has jurisdiction over Capitol's equitable subrogation claims under FAR 52.232-16, the court now turns to whether Capitol has alleged sufficient facts to state equitable subrogation claims under FAR 52.232-16(a) and (c). The Federal Circuit has explained that an equitable subrogation claim is based on the theory "that the triggering of a surety's bond obligation gives rise to an implied assignment of rights by operation of law whereby the surety 'is subrogated to the [principal obligor's] property rights in the contract balance.'" *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1312 (Fed Cir. 2011) (quoting *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1161 (Fed Cir. 1985).[7] "[A] legally enforceable duty can arise between the government and a surety if the surety notifies the government that its principal is in default of the bond agreement." *Hanover Ins. Co. v. United States*, 133 Fed. Cl. 633, 635 (2017) (citing *Balboa Ins. Co.*, 775 F.2d at 1164). The court in a case affirmed by the Federal Circuit has also recognized that notice to the government that the contractor "is in danger of defaulting under the bond" from other sources besides the surety may be adequate to trigger the assignment of rights to the surety. *Hartford Fire*

---

[7] Although ordinarily, a surety "asserts the doctrine of equitable subrogation to acquire retained contract funds that are still in the government's possession after performance of the contract is complete[,]" *Hartford Fire Ins. Co. v. United States*, 108 Fed. Cl. 525, 532 (2012) (citing *Prairie State Nat'l Bank of Chicago v. United States*, 164 U.S. 227, 227-28 (1986)), the doctrine allows "a surety to recover from the government when the government abuses its discretion in disbursing earned progress payments." *Id*

*Ins. Co. v. United States*, 40 Fed. Cl. 520, 522-23 (1988), *aff'd*, 185 F.3d 885 (Fed. Cir. 1999); *see Capitol Indem. Corp. v. United States*, 71 Fed. Cl. 98, 102-03 (2006) (stating that "a payment bond surety must notify the government that the contractor is or is close to being inn default"). Finally, a surety's equitable subrogation rights can be triggered where the government "had knowledge of the default . . . and so informed the surety." *Lumbermens Mut. Cas. Co.*, 654 F.3d at 1313 (quoting *Nat'l Surety Corp. v. United States*, 118 F.3d 1542, 1547 (Fed. Cir. 1997)).

Capitol alleges in its complaint that its equitable subrogation rights were triggered on September 30, 2015, when the Army informed Capitol of Redstick's performance issues and the missed September 2015 contract deadline. Am. Compl. ¶ 29. Yet, the government persuasively argues the September 30, 2015 communications could not have triggered Capitol's equitable subrogation rights as a matter of law because Capitol did not take any action at that time to acknowledge its potential liability as the surety and made no objections to the progress payments submitted to Redstick after September 30, 2015. *See* Def.'s Supp. Mot. at 6. Moreover, it is clear from the facts alleged that the Army did not consider Redstick to be in default in September 2015. Rather, the alleged facts indicate that between September 2015 and December 30, 2015 the Army was working with Redstick to complete the Contract. Def.'s Supp. Mot. at 19. The court agrees that where the alleged facts show that (1) Capitol did not assert its surety rights and (2) Redstick was still working with the government to resolve its problems with contract performance, the government did not have "knowledge of the default" under the Bonds between September and December 2015. Thus, Capitol's equitable subrogation rights

were not triggered. *Lumbermens Mut. Cas. Co.*, 654 F.3d at 1313 (internal quotation marks and citation omitted).

Capitol argues in the alternative that its equitable subrogation rights were triggered by the Army's actions starting on December 30, 2015, when the Army informed Capitol that Capitol "should be receiving Payment Bond claims," when the Army then "suspended  Redstick" on January 4, 2016, and when the Army received Capitol's January 13, 2016 request that the Army issue checks payable to both Redstick and the subcontractors. *See* Am. Compl. ¶¶ 28-31, *id.* Ex. E at 2. Capitol alleges these events occurred before the Army paid Redstick's ninth progress payment, and that, therefore Capitol is entitled to the ninth progress payment under the equitable subrogation doctrine.

While the court agrees with the government that the knowledge of a contractor's failure to make subcontractor payments alone does not constitute adequate notice to establish a claim for equitable subrogation, *see Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 499 (Fed. Cir. 1990), here Capitol has alleged more than a failure to pay subcontractors. Rather, Capitol alleges that the Army's actions after December 30, 2015, when taken together, are sufficient to state a claim for equitable subrogation for the ninth progress payment. *See Balboa Ins. Co.*, 775 F.2d at 1160 (treating notice that the principal "was in financial straits and would not be able to fulfill its payment and performance obligations" and "demanding that no further contract funds be released without its consent" as sufficient notice of potential default); *Am. Fid. Fire Ins. Co. v. United States*, 513 F.2d 1375, 1377 n.1, 1380-81 (Ct. Cl. 1975) (finding a letter stating "please consider this letter formal demand that any monies due under the above contract

be forthwith distributed to and placed with [the surety]" as sufficient notice of default). Capitol's allegations of the communications between the Army and Capitol that preceded the ninth progress payment are tantamount to Capitol acknowledging that Redstick had defaulted and that Capitol was responsible.[8] The court concludes that this is enough to trigger Capitol's equitable subrogation rights.

For these reasons, the court **DENIES** the government's motion to dismiss Capitol's claims under FAR 52.232-16(a) and (c) regarding the ninth progress payment. Capitol's equitable subrogation claim for the ninth progress payment may proceed. The court **GRANTS** the government's motion to dismiss Capitol's claims under FAR 52.232-16(a) and (c) for progress payments made prior to the ninth progress payment.

### B.   Claims Based on the Demand to Reinstall the Gym Floor after Accepting and Paying Redstick for the Gym Floor

Capitol asserts that it is entitled to an equitable adjustment in the amount of an additional $135,065.69 under FAR 252.243-7002(a) for the work it performed on the gym floor. Capitol claims that because the Army allegedly accepted Redstick's gym floor

---

[8] In addition, the court finds the government's argument that Capitol's claims under FAR 52.232-16 should be dismissed as a matter of law because FAR 52.232-16 did "not create any 'mandatory obligations' for the [CO] in this case" is unpersuasive. *See* Def.'s Supp. Reply at 5. The government contends that FAR 52.232-16 "only applies to progress payments made based on costs incurred" and here "the Army made progress payments to Redstick based on work accomplished." Def.'s Supp. Reply at 5. However, Capitol has alleged that FAR 52.232-16 was incorporated to the contract in full, Capitol issued bonds based on the terms of that contract, and the Army made progress payments inconsistent with FAR 52.232-16. The government's argument, properly construed, is a dispute with Capitol's allegation that the parties understood that FAR 52.232-16 regulated progress payments. The government's disagreement with this allegation, which the court takes to be true, is not an appropriate ground for dismissal under RCFC 12(b)(6).

and paid Redstick for the gym floor work, the Army's May 4, 2016 demand that Capitol reinstall the gym floor amounted to a contract modification. *See* Am. Compl. ¶ 61.

The government argues that Capitol's claim is barred by the terms of the Takeover Agreement, in which Capitol agreed to reinstall the gym floor in return for only the remaining contract funds. Def.'s Supp. Mot. at 20-21. In addition, the government argues that Capitol has not identified any cognizable contract modification because the attachments to the original contract (not in the amended complaint), the Army's alleged May 4, 2016 demand to Capitol, and the attachments to the Takeover Agreement (not in the amended complaint) all use the same language to describe the manner in which the gym floor must be installed and Capitol agreed to perform the work in the Takeover Agreement. *Id.*[9]

FAR 252.243-7002(a) provides that the "amount of any request for equitable adjustment to contract terms shall accurately reflect the contract adjustment for which the Contractor believes the Government is liable." "The changes clause is invoked when the contracting officer decides to expand the limits of work." *Conner Bros. Cons. Co., Inc. v. United States*, 65 Fed. Cl. 657, 678 (2005).

---

[9] The government also argues that to the extent this claim is raised under the CDA, the court is without jurisdiction because the claim was not lawfully assigned. Def.'s Supp. Mot. at 20. First, Capitol's gym floor claim is raised under the doctrine of equitable subrogation rather than the CDA because it occurred after Redstick's default but prior to the Takeover Agreement. Second, even if this claim was raised under the CDA and required assignment, the government's argument cannot be resolved on this motion to dismiss for the reasons discussed below regarding the HVAC claim. *See infra* Part III.C.

The court concludes, taking Capitol's allegations to be true, that Capitol has stated a claim for $135,065.69 based on the theory of a contract adjustment. The government's argument that the Takeover Agreement precludes Capitol's claim is contradicted by Capitol's factual allegations that Capitol was not relinquishing a claim for *reinstalling* the gym floor after Capitol learned that the gym floor work had been accepted and paid for by the Army while Redstick was performing. Therefore, the court **DENIES** the government's motion to dismiss the gym floor claim.

### C.     Claim Based on the Equitable Adjustment for Alleged Additional HVAC Work

Capitol alleges that it is owed $94,847.10 in damages in connection with the Army's alleged modification to the scope of work on the HVAC portion of Redstick's Contract. Capitol asserts that through its General Indemnity Agreement with Redstick, Redstick assigned this claim to Capitol and that the government consented to this assignment in the Takeover Agreement. *See* Am. Comp. ¶ 64.

The government, in its motion to dismiss, contends that Capitol's assignment is not valid and that Capitol cannot maintain this claim because it was not in privity of contract with the Army during the relevant time period. *See* Def.'s Supp. Mot. at 20-21. The government argues that even if the claim was lawfully assigned, Redstick released the Army from liability for the claim. *Id.* at 22.[10] Finally, the government argues that

---

[10] Each of the releases stated that Redstick "does release and discharge the Government its officers, agents and employees of and from all liabilities, obligations and claims whatsoever in law and equity arising out of or by virtue of said contract, except specified claims in the stated amounts, or in estimated amounts when the amounts are not susceptible of exact statement by the

even if the claim was not released by Redstick, Redstick never provided notice of the alleged contract change within 20 days of incurring the costs as required by FAR 52.243-4 and thus the government cannot be liable for the claim.[11] *Id*. at 25.

The legality of any assignment to Capitol from Redstick and thus whether this court has jurisdiction to hear Capitol's claim is properly construed as a challenge to the facts alleged in the complaint that the Army assented to the assignment of Redstick's claims. *See Ham Investments, LLC v. United States*, 388 Fed. App'x 958, 960 (Fed. Cir. 2010) (discussing how the government may assent to the assignment of claims).[12] In addition, whether Redstick complied with the FAR and preserved a claim for payment or released the claim for additional HVAC work requires the court to consider evidence outside the complaint including the releases themselves. As with Capitol's claim regarding the gym floor, these are matters that cannot be resolved on this motion to dismiss and the government's argument is appropriate only in a motion for summary judgment. *See* RCFC 12(d) ("If, on a motion under RCFC 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated

---

contractor[.]" *Id*. at Supp. App. 3. These releases were not included nor explicitly referenced in the amended complaint.

[11] FAR 52.243-4(d) states in relevant part "no adjustment for any change . . . shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required."

[12] To the extent the government argues that the question of assignment is jurisdictional and the court may consider documents outside the complaint to resolve this factual dispute, Def.'s Supp. Brief (ECF No. 34), the court finds it involves "issues of fact [that] are central to both jurisdiction and the merits" and the court will "assert jurisdiction for the purpose of establishing relevant facts." *See U.S. Fire Ins. Co. v. United States*, 78 Fed. Cl. 308, 324 (2007). The record has not been sufficiently developed at this stage of the litigation to establish the relevant facts.

as one for summary judgment" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion"). Finally, the government's argument that Capitol failed to state a claim because there is no allegation that Redstick provided notice within the requisite time period under FAR 52.243-4 is unpersuasive at this stage of the litigation. Here, Capitol has alleged that the Army waived the notice requirement because it explicitly told subcontractors that a claim for the additional HVAC work could be brought at a later time. Therefore, the government's motion to dismiss Capitol's HVAC claim is **DENIED**.

## CONCLUSION

For the reasons stated above, the government's motion to dismiss is **GRANTED IN PART AND DENIED IN PART**. The court **GRANTS** the government's motion to dismiss Capitol's claim for progress payments under FAR 52.232-16(a) and (c) except for the ninth progress payment. The government's remaining arguments regarding the ninth progress payment, the gym floor, and HVAC work are **DENIED**. The parties are further **ORDERED** to submit a joint status report by **Wednesday, March 18, 2020** with a proposed schedule for discovery.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge