# In the United States Court of Federal Claims

No. 18-916 C
(Filed: October 04, 2022)

```
* * * * * * * * * * * * * * * **  *
                                  *
CAPITOL INDEMNITY CORP.,          *
                                  *
                  Plaintiff,      *
                                  *
        v.                        *
                                  *
THE UNITED STATES,                *
                                  *
                  Defendant.      *
                                  *
   * * * * * * * * * * * * * * * *  *
```

*Ian M. McLin*, Langley & Banack, Inc., of San Antonio, TX, for Plaintiff.

*Matthew J. Carhart*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, with whom were *Deborah A. Bynum*, Assistant Director, *Martin F. Hockey, Jr.*, Acting Director, and *Brian M. Boynton*, Acting Assistant Attorney General, all of Washington, D.C., for Defendant, and *Major Tarik Downie*, General Litigation Branch, U.S. Army Legal Services Agency, Department of the Army, of Fort Belvoir, VA, of counsel.

## OPINION AND ORDER

SOMERS, Judge.

This case concerns Plaintiff Capitol Indemnity Corporation's ("Capitol") claims for damages it allegedly incurred as surety for a contractor, Redstick, Inc. ("Redstick"), that was hired by the U.S. Army ("Army") to renovate a fitness facility at Fort Hood in Texas. Following Redstick's termination for default by the Army, Plaintiff completed the remaining work on the contract, paid Redstick's subcontractors, and subsequently filed claims against the Army for payment—including for allegedly improper progress payments the Army issued to Redstick; for certain allegedly unpaid additional work undertaken by Redstick; and for subsequent costs Plaintiff incurred for having to correct Redstick's work on the gym floor—all of which the Army denied. Plaintiff thereafter filed suit in this Court seeking damages under the theories of equitable subrogation and equitable adjustment, and under the Contract Disputes Act ("CDA").

In February 2020, the previously assigned judge in this matter granted in part and denied in part the government's motion to dismiss. *See Capitol Indem. Corp. v. United States*, 147 Fed. Cl. 371 (2020). This opinion concerns Plaintiff's claims that survived dismissal, which are now before the Court on cross-motions for summary judgment. For the reasons that follow, the Court

denies Plaintiff's motion for partial summary judgment and grants the government's motion for summary judgment on all counts.

## BACKGROUND AND PROCEDURAL HISTORY

**A.    Contract Award, Bond Agreements, and Progress Payments to Redstick**

On September 27, 2014, the Army awarded a contract (W91151-14-C-0061) to Redstick for the renovation of the Iron Horse Gym at Fort Hood, which, after amendments, had a total contract price of over $2.3 million. ECF No. 63 ¶ 11 ("Pl.'s Partial Summ. J. Mot."); ECF No. 68 at 2 ("Gov.'s Cross-Mot. Summ. J."). The contract period-of-performance ("POP") had an end-date of September 30, 2015. Pl.'s Partial Summ. J. Mot. ¶ 12; Gov.'s Cross-Mot. Summ. J. at 2. The purpose of the contract was

> to repair building 37017, Iron Horse Gym, and renovate it to better meet the needs of the users as a "functional fitness" facility. This includes, but is not limited to, repairing any damage left by the current occupants, replacing/repairing finishes throughout the facility, fully replacing existing ceilings, insulating the entire envelope, furring out walls, reconfiguring of latrines to accommodate ABA guidelines, various other aesthetic alterations, full replacement of windows throughout the facility, complete replacement of HVAC systems, and electrical work to support the new layout. Also included are various repairs and reconfigurations of the site to include sidewalks and parking lot.

Gov.'s Cross-Mot. Summ. J. at 2 (citing ECF 68-2 at 8 (government's "A86")).

The contract, bonded pursuant to the Miller Act, 40 U.S.C. § 3131, required Redstick to provide performance and payment bonds. Pl.'s Partial Summ. J. Mot. ¶ 13; Gov.'s Cross-Mot. Summ. J. at 2–3. Accordingly, Redstick sought—and on October 2, 2014, Plaintiff issued—performance and payment bonds, requiring Plaintiff as the surety "to either perform any contract work that Redstick does not complete, or pay for that uncompleted work . . . and a payment bond, requiring it to pay subcontractors for labor and materials if Redstick fails to do so." Gov.'s Cross-Mot. Summ. J. at 2–3 (record citations omitted); *see also* Pl.'s Partial Summ. J. Mot. ¶ 13. Plaintiff "executed and issued the Bonds based upon the terms and conditions set forth in the Contract and the General Indemnity Agreement." *Id.* ¶ 13. The "General Indemnity Agreement," an agreement between Redstick and Plaintiff executed approximately two weeks *before* Plaintiff was awarded the contract, purported to "assign[] to Capitol all rights in Redstick's property, including all contracts," *id.* ¶ 9, in the event of Redstick's default on a contract for which Plaintiff had issued a bond, ECF No. 23 ¶ 6 ("Amend. Compl."). *See also* Pl.'s Partial Summ. J. Mot. ¶ 10.

The contract awarded to Redstick incorporated by reference several provisions within the Federal Acquisition Regulation ("FAR"), two of which in particular concern the contracting officer's authority to make progress payments throughout the term of the contract to the contractor. *See generally id.* ¶¶ 14–20; Gov.'s Cross-Mot. Summ. J. at 7–8. First, the contract incorporated by reference FAR 52.232-5, *see* ECF No. 68-2 at 12 (government's "A90"),

concerning "Payments under Fixed-Price Construction Contracts," which provides in relevant part that "[t]he Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer."  FAR 52.232-5(b).  Furthermore, the section provides that "if satisfactory progress has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved."  FAR 52.232-5(e). Second, the contract incorporated FAR 52.232-16, *see* ECF No. 68-2 at 25–26 (government's "A103–A104"), concerning "Progress Payments," which provides in relevant part that "[t]he total amount of progress payments shall not exceed 80 percent of the total contract price."  FAR 52.232-16(a)(6).  The contract also contained a provision titled "Eligibility for Payment/Construction Contract Progress Payment Requests," which provides that "[n]o progress payments are authorized above 80% of the contract value."  ECF No. 23-2 at 48–49 (Plaintiff's "Exhibit 'B'").

It is undisputed that, over the course of the project, Redstick experienced difficulties with contract performance.  *See, e.g.*, Gov.'s Cross-Mot. Summ. J. at 3; Pl.'s Partial Summ. J. Mot. ¶ 21.  Redstick did not complete performance by the POP end-date of September 30, 2015.  Pl.'s Partial Summ. J. Mot. ¶ 26.  Nor, allegedly, did Redstick fulfill obligations to pay its subcontractors.  *Id.* ¶ 25; Gov.'s Cross-Mot. Summ. J. at 4.  Nonetheless, the government continued making progress payments to Redstick through January 29, 2016, when it issued the ninth and final progress payment that Redstick would receive.  Gov.'s Cross-Mot. Summ. J. at 10; Pl.'s Partial Summ. J. Mot. ¶ 78.  Ultimately, on March 28, 2016, the government declared Redstick to be in default and terminated the original contract after Redstick abandoned performance.  Pl.'s Partial Summ. J. Mot. ¶ 55; Gov.'s Cross-Mot. Summ. J. at 14.

The briefing, as well as an opinion in this matter issued by Judge Firestone on the government's motion to dismiss, contain a multitude of factual allegations and competing narratives—dating back to September 2015—regarding who-knew-what (and when) about Redstick's difficulties.  *See, e.g.*, *Capitol Indem. Corp.*, 147 Fed. Cl. at 375–76; Pl.'s Partial Summ. J. Mot. ¶¶ 21–48; Gov.'s Cross-Mot. Summ. J. at 4–14.  However, as detailed more fully below, the remaining dispute in this case largely concerns the propriety of the government issuing Redstick the ninth progress payment rather than retaining it for the benefit of Plaintiff, given Redstick's failure to complete performance.  *See Capitol Indem. Corp.*, 147 Fed. Cl. at 380–81 ("Capitol alleges that the Army's actions after December 30, 2015, when taken together, are sufficient to state a claim for equitable subrogation for the ninth progress payment. . . . Capitol's allegations of the communications between the Army and Capitol that preceded the ninth progress payment are tantamount to Capitol acknowledging that Redstick had defaulted and that Capitol was responsible.  The court concludes that this is enough to trigger Capitol's equitable subrogation rights.") (citations and footnote omitted).  Accordingly, the Court briefly restates here only those factual allegations relating to the period on or after December 30, 2015. *See* Gov.'s Cross-Mot. Summ. J. at 8 n.3 ("[Judge Firestone] dismissed Capitol Indemnity's claims related to progress payments prior to progress payment number nine.  Capitol Indemnity's motion nevertheless spends almost four pages describing progress payment number five through progress payment number eight.").

On December 30, 2015, the Army responded to an email inquiry from Plaintiff's representative concerning "job completion status," wherein the Army informed Plaintiff's representative that, while Redstick's work on the project was progressing "satisfactorily," the project completion date was "[u]nknown," the "[c]ontractor and subcontractor (HVAC) are performing minimal work," and the "[s]ubcontractor claims he has not been paid." *Id.* at 11; *see also* Pl.'s Partial Summ. J. Mot. ¶ 29 (citing ECF No. 63-2 at 37–38 ("Capitol3278–79")).

Next, on January 4, 2016, the Army's contracting officer emailed Redstick's representative, stating in relevant part that "I have received your spreadsheets for overhead you claim is owed to you in light of the government's suspension of work under [the contract]." ECF No. 63-2 at 39 ("Capitol3289")). According to Plaintiff, this email establishes that, "[a]lthough Redstick . . . was suspended by the Government on or before January 4, 2016, Redstick still submitted its Request for Progress Payment No. 9 ('Pay Request 9'), dated January 7, 2016, seeking payment of $230,792.86 for work allegedly done between November 30 and December 25, 2015." Pl.'s Partial Summ. J. Mot. ¶ 43 (footnote omitted). According to the government, however, Plaintiff's assertion "is based on the complaint's misreading of an email relating to Redstick's request for an equitable adjustment for a *previous* suspension of Redstick that is not at issue in this case." Gov.'s Cross-Mot. Summ. J. at 32 (citations omitted) (emphasis in original).

On January 13, 2016, Plaintiff's representative emailed the Army, stating in relevant part that "[w]e have received payment bond claims from [Redstick's subcontractors]. Is it possible, going forward, to issue joint checks payable to both Redstick and their subcontractors?" ECF No. 63-2 at 34 ("Capitol3264"). The same day, the Army responded that "[t]hat would have to be a DFAS action and will require an Assignment of Claims from Redstick Inc to CapSpecialty to allow DFAS to pay the surety so you could make the payments to the subcontractors and Redstick. At this point, I don't know that Redstick would do that." *Id.* There is nothing in the record suggesting that any further follow-up occurred between the parties on this question. *See, e.g.*, ECF No. 72 ¶ 59 ("Pl.'s Resp. & Reply"); Gov.'s Cross-Mot. Summ. J. at 31.

On January 29, 2016, the government issued the ninth progress payment to Redstick. Gov.'s Cross-Mot. Summ. J. at 10; Pl.'s Partial Summ. J. Mot. ¶ 78. Weeks later, on February 18, 2016, Plaintiff's representative emailed the Army asking "[a]re there any updates on the completion of this project?" ECF No. 68-1 at 63–64 (government's "A61–62").[1]

---

[1] Plaintiff begins its responsive brief by objecting to the government's summary judgment evidence, including the documents (such as the Army contracting officer's own emails) submitted by the government in connection with the declaration of Neta Singley, the contracting officer on the instant contract. *See* Pl.'s Resp. & Reply ¶¶ 4–7. Plaintiff's generic objections—perhaps offered in hopes of not having to rebut the government's factual allegations in its cross-motion for summary judgment—are without merit. *See Marine Indus. Constr., LLC v. United States*, 151 Fed. Cl. 349, 359 (2020) ("The documents plaintiff objects to do not risk, 'as a matter of reasonable probability,' misidentification and adulteration, and plaintiff failed to specifically dispute the content of any of the documents or assert where or how the documents were adulterated." (citations omitted)). Plaintiff's objections even include one to an email that Plaintiff itself used in support for its own motion for summary judgment. *See id.* ("Plaintiff used one of the disputed documents . . . in its summary judgment briefing, where it did not raise any question or dispute as to the [] content.") (internal quotation removed). Specifically, in its response and reply brief, Plaintiff "objects to the [government's] Declaration of Neta Singley

Finally, on March 3, 2016, Plaintiff asked the Army to stop distributing progress payments to Redstick, Pl.'s Resp. & Reply ¶ 66 (citing ECF No. 68-1 at 49 (government's "A47") ("We ask that no further contract funds or retention be released to Redstick without Capitol Indemnity's express written permission.")), and on March 28, 2016, the contracting officer terminated the contract for default after Redstick abandoned performance, Gov.'s Cross-Mot. Summ. J. at 14. By the time of Redstick's termination, the Army's nine progress payments to Redstick totaled 90% of the contract price, leaving a contract balance of $230,792.85. Gov.'s Cross-Mot. Summ. J. at 14; *see also* Pl.'s Partial Summ. J. Mot. ¶ 32.

**B.    Takeover Agreement**

On April 7, 2016, the government called upon Plaintiff, as Redstick's surety, "to take over and complete the project in fulfillment of its Performance Bond obligations." ECF No. 63-2 at 23 (Plaintiff's "Capitol2758"); *see also* Gov.'s Cross-Mot. Summ. J. at 15. Formalizing the arrangement, Plaintiff and the government executed a takeover agreement ("Takeover Agreement") on May 13, 2016. ECF No. 68-2 at 78–84 (government's "A156–62"). Therein, the government agreed to release to Plaintiff the $230,792.85 contract balance upon Plaintiff's successful completion of the work. *Id.* at 79 (government's "A157"). The Takeover Agreement provides that Plaintiff

> hereby undertakes to cause the performance of the Work, including correcting patent defects, a list of which is set forth in Exhibit 'A' of this Agreement, and any latent defects in the work performed by [Redstick], to be completed in accordance with each and every one of the terms, covenants and conditions of the Original Contract, including all modifications thereto, and agrees to be bound thereby.

*Id.* at 78 (government's "A156"). It also states that Plaintiff "does not agree that any of the items on Exhibit 'A' constitute patent defects and shall have the right to have items removed from the list that it demonstrates are not patent defects, by mutual consent of the parties to this Agreement." *Id.* As to the gym floor, Exhibit A of the Takeover Agreement provides that the "[f]loor surface below rubber flooring will be floated to ensure a flat, smooth look. Remove rubber flooring, float floor, and re-install rubber flooring." *Id.* at 85 (government's "A163").

Furthermore, paragraph 13 of the Takeover Agreement provides as follows:

---

('Declaration') because she is not a proper custodian of records to authenticate documents," "the Declaration contains hearsay statements, factual conclusions, and legal conclusions which do not constitute proper summary judgment evidence," and "the Declaration contains statements violating the parol evidence rule which, again, do not constitute proper summary judgment evidence." Pl.'s Resp. & Reply ¶ 4. Therefore, Plaintiff "objects to . . . Exhibits A through P attached to the Declaration all as hearsay." *Id.* ¶ 7. Yet, the government's "Exhibit F," *see* ECF No. 68-1 at 30, one of the many documents to which Plaintiff objects, includes a copy of the very same January 4, 2016, Singley email that Plaintiff submitted as evidence of notice to the government of Redstick's default, *see* ECF No. 63-2 at 39 ("Capitol3289").

(a)  Surety expressly reserves all prior rights, equitable liens and subrogation rights under the contract, performance bond, payment bond, at law or in equity, as well as the Surety's own rights dating back to the execution of the bond, to include, but not be limited to, those rights and remedies that accrued prior to former Contractor's Termination, Contractor's default, and those rights and remedies that may accrue during the completion of the contract, including any and all claims of overpayment and/or payments in violation of the terms of the Contract to the Contractor arising under the subject Contract.  No waiver of such rights is agreed to or implied, regardless of any provisions of this Agreement to the contrary and Owner acknowledges Contractor's assignment of such claims and causes of action to Surety.

(b)  To the extent necessary, if Surety elects to pursue any claims of former contractor arising under the contract in its own name and for its own benefit, Owner hereby acknowledges and consent [sic] to the assignment of all of former contractor's claims to Surety under the contract, to the extent permitted by law, including but not limited to, the right of Surety to assert, in its own name and for its own benefit, all of former Contractor's and any of Contractor's subcontractor's claims for equitable adjustment to the Contract Price or time under the subject Contract, whether arising prior to or after the default.

*Id.* at 82 (government's "A160").

## C.    Plaintiff's Certified Claim to the Contracting Officer

On March 22, 2017, following completion of performance on the contract, Plaintiff submitted a claim to the contracting officer for $693,569.92.  Pl.'s Partial Summ. J. Mot. ¶ 61; ECF No. 68-2 at 91 (government's "A169").  The claim consisted of three components.  First, Plaintiff sought $463,657.13, reflecting the amount Plaintiff believed the government overpaid to Redstick after the government allegedly had notice of Redstick's failure to pay its subcontractors.  ECF No. 68-2 at 92–97 (government's "A170–75").  Second, Plaintiff sought a $135,065.69 adjustment for costs associated with fixing the gym floor, after the Army allegedly failed to stop Redstick's work on the floor even though the Army deemed it unacceptable.  *Id.* at 97–101 (government's "A175–79").  Third, Plaintiff sought $94,847.10, reflecting the amount Plaintiff believed the government owed to one of Redstick's subcontractors—and thus, now owes to Plaintiff as Redstick's purported assignee—for additional HVAC work that was allegedly directed by the contracting officer's representative.  *Id.* at 102–04 (government's "A180–82").

On July 24, 2017, the contracting officer denied Plaintiff's claim in its entirety.  *See id.* at 192–96 (government's "A467–71").  Plaintiff appealed to the Armed Services Board of Contract Appeals, but Plaintiff and the government (which had moved to dismiss for lack of jurisdiction) subsequently entered a joint stipulation of dismissal without prejudice.  *Id.* at 205 (government's "A480").

D.    **Plaintiff's Complaint, Partial Dismissal, and the Pending Cross-Motions for Summary Judgment**

On June 26, 2018, Plaintiff filed its two-count complaint in this Court and thereafter filed its first amended complaint on May 29, 2019. In Count I, Plaintiff alleges it is entitled under the theory of equitable subrogation to the fifth-through-ninth progress payments the Army paid Redstick after the Army allegedly had notice of Redstick's default, which Plaintiff argues was as early as September 30, 2015, the POP end-date. Amend. Compl. ¶¶ 29, 48–51. Furthermore, Plaintiff alleges that the contracting officer made these progress payments to Redstick in violation of the contract's terms and incorporated FAR provisions, including the provision prohibiting progress payments in excess of 80% of the contract price. *Id.* ¶¶ 52–60. Plaintiff claims the Army "overpaid Redstick to the detriment of CAPITOL in amount of at least $463,657.13," for which Plaintiff claims entitlement under equitable subrogation. *Id.* ¶ 60. Under the same count, Plaintiff seeks an "equitable adjustment" for costs associated with correcting and reinstalling Redstick's deficient work on the gym floor, for which Plaintiff claims the Army should have issued a stop work order but instead accepted and paid Redstick. *Id.* ¶¶ 61–62.

In Count II, Plaintiff alleges a breach of contract claim under the CDA, as Redstick's purported assignee via the General Indemnity Agreement, asserting that the Army "demanded and directed changes and/or modifications to the work and/or scope of the work on the Project by the HVAC subcontractor failing to pay for the same and obtaining a release without consideration from Redstick . . . ." *Id.* ¶ 65. This "additional work," in Plaintiff's view, "constituted a constructive change in that Redstick performed work beyond the contractual requirements," which "was ordered, expressly or impliedly, by Defendant." *Id.* Plaintiff alleges that the government acknowledged and consented in the Takeover Agreement to the assignment of this claim by Redstick to Plaintiff. *Id.* ¶ 64.

On February 21, 2020, the previously assigned judge in this matter, Judge Firestone, granted in part the government's motion to dismiss Plaintiff's amended complaint. *See Capitol Indem. Corp.*, 147 Fed. Cl. 371. Judge Firestone dismissed Plaintiff's equitable subrogation claims for progress payments prior to the ninth progress payment (payments five through eight), reasoning that "where the alleged facts show that (1) Capitol did not assert its surety rights and (2) Redstick was still working with the government to resolve its problems with contract performance, the government did not have 'knowledge of the default' under the Bonds between September and December 2015. Thus, Capitol's equitable subrogation rights were not triggered." *Id.* at 380.

Judge Firestone denied the government's motion to dismiss the portions of the amended complaint alleging that Plaintiff was entitled under the theory of equitable subrogation to progress payment number nine; that Plaintiff was entitled to an equitable adjustment for work it did to repair and reinstall the gym floor; and that Plaintiff was entitled to recover for "additional work" that Redstick did on the HVAC system. As to progress payment number nine, Judge Firestone concluded that three factual allegations Plaintiff made in its amended complaint, if proved, "are tantamount to Capitol acknowledging that Redstick had defaulted and that Capitol was responsible," which "is enough to trigger Capitol's equitable subrogation rights." *Id.* at 380-

81 (footnote omitted).  Judge Firestone, thus, allowed Plaintiff's claim to the ninth progress payment to move forward, citing "the Army's actions starting on December 30, 2015, when the Army informed Capitol that Capitol 'should be receiving Payment Bond claims,' when the Army then 'suspended Redstick' on January 4, 2016, and when the Army received Capitol's January 13, 2016 request that the Army issue checks payable to both Redstick and the subcontractors." *Id.* at 380.

As to Plaintiff's equitable adjustment claim related to its work on the gym floor, the government had argued it was precluded by the Takeover Agreement, but Judge Firestone held, "taking Capitol's allegations to be true, that Capitol has stated a claim for $135,065.69 based on the theory of a contract adjustment."  *Id.* at 381.  Judge Firestone continued, "[t]he government's argument that the Takeover Agreement precludes Capitol's claim is contradicted by Capitol's factual allegations that Capitol was not relinquishing a claim for *reinstalling* the gym floor after Capitol learned that the gym floor work had been accepted and paid for by the Army while Redstick was performing."  *Id.* (emphasis in original).

Finally, as to Plaintiff's equitable adjustment claim under the CDA for Redstick's "additional work" on the HVAC system, the government argued that the claim was released by Redstick; that it was not validly assigned from Redstick to Capitol; and that Redstick did not provide notice of the claim as required by FAR 52.243-4.  *Id.*  Judge Firestone concluded that the government's arguments were challenges to the facts presented in Plaintiff's amended complaint and, therefore, could not appropriately be decided on a motion to dismiss.  *Id.*

On August 29, 2021, Plaintiff moved for partial summary judgment on the two claims it brings under an equitable subrogation theory but did not seek summary judgment on its HVAC claim.  *See generally* Pl.'s Partial Summ. J. Mot.  The government cross-moved for summary judgment on all three of Plaintiff's claims.  *See generally* Gov.'s Cross-Mot. Summ. J.  The parties' respective arguments are detailed in the Court's analysis below.  On March 17, 2022, the Court held oral argument on the pending motions, which are now ripe for consideration.

## DISCUSSION

### A.    Legal Standard

#### 1.    Summary Judgment

Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC") provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the . . . court of the basis for its motion" and must identify the portions of the record that "it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former version of Fed. R. Civ. P. 56(c)).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be

no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Material facts are those that "might affect the outcome of the suit under the governing law . . . ." *Id*. at 248. For a dispute over a material fact to be genuine, the evidence must be "such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id*. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." RCFC 56(c)(1)(A)–(B).

The judge's function at the summary judgment stage "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," *Anderson*, 477 U.S. at 249, bearing in mind that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *id*. at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" thus making summary judgment appropriate. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

The foregoing also applies in cases, as here, in which the parties have cross-moved for summary judgment. *See Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968–69 (Fed. Cir. 2009). "[E]ach motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered." *Id*. (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)). "To the extent there is a genuine issue of material fact, both motions must be denied." *Id*. at 969.

## 2.    Equitable Subrogation

"The doctrine of equitable subrogation entitles a surety that 'takes over contract performance' or 'finances completion of the defaulted contract' to 'succeed to the contractual rights of a contractor against the government.'" *Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344, 1351 (Fed. Cir. 2002) ("*Fireman's Fund*") (quoting *Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1370 (Fed. Cir. 2001)). In that sense, equitable subrogation can permit "sureties to sue the United States under government contracts to which they were not a party. *Id*. (citing *Balboa Ins. Co. v. United States,* 775 F.2d 1158, 1160 (Fed. Cir. 1985) ("*Balboa*") and *Transamerica Ins. Co. v. United States,* 989 F.2d 1188 (Fed. Cir. 1993)).

Equitable subrogation "is based on the view that the triggering of a surety's bond obligation gives rise to an implied assignment of rights by operation of law whereby the surety 'is subrogated to the [principal obligor's] property rights in the contract balance.'" *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1312 (Fed. Cir. 2011) ("*Lumbermens*") (quoting *Balboa*, 775 F.2d at 1161 (emphasis omitted)). "Equitable subrogation can be used to recover improper payments to a principal obligor only if made after the obligee received notice of the principal obligor's default (i.e., notice that the bond obligation has been triggered and an implied assignment of the contract rights to the surety has occurred)." *Id.* More succinctly, "equitable

subrogation permits a surety to recover improper payments *only if* made after the obligee was on notice of the principal obligor's default." *Id.* at 1313 (emphasis added).

## B.     Analysis

### 1.   Plaintiff's Claim, as Equitable Subrogee, to the Ninth Progress Payment

The Court first analyzes Plaintiff's claim that it is entitled, as Redstick's equitable subrogee, to the money it spent in satisfying the payment bond claims.[2]  Plaintiff asserts that it received payment bond claims from Redstick's subcontractors that totaled $736,793.19 and paid those claims pursuant to the payment bond.  Pl.'s Partial Summ. J. Mot. ¶ 76.  Plaintiff claims that had the government withheld the ninth progress payment, as it was allegedly required to do, that money would have been available to Plaintiff to offset some of the cost of the payment bond claims it paid.  *See id*.  Although the ninth progress payment is insufficient to offset fully the payment bond claims, as discussed above, Judge Firestone dismissed Plaintiff's equitable subrogation claims to progress payments preceding the ninth progress payment, finding that Plaintiff had not alleged sufficient facts to support its claims to such payments.  *See Capitol Indem. Corp.*, 147 Fed. Cl. at 380.  Accordingly, in terms of equitable subrogation, all that is potentially left for Plaintiff is $230,792.86, the amount of the ninth progress payment.  Therefore, the question now before the Court is whether Plaintiff was equitably subrogated to Redstick prior to the ninth progress payment, such that the government's payment to Redstick of the ninth progress payment may have been improper.

Plaintiff, citing Judge Firestone's opinion, contends that "[t]his Court has already held that Capitol is entitled to equitable subrogation regarding its payment of such subcontractor claims, at least to the extent of the value of the ninth progress payment that the Government made to Redstick after having notice of Redstick's default or impending default."  Pl.'s Partial Summ. J. Mot. ¶ 76.  Plaintiff asserts that it "has argued, and this Court has agreed, that [Plaintiff's] equitable subrogation rights were triggered by the Government's (Army's) actions starting on December 30, 2015, when (a) the Government (Army) informed Capitol that it 'should be receiving Payment Bond claims'; (b) the Government (Army) then 'suspended Redstick' on January 4, 2016; and (c) the Government (Army) received Capitol's January 13, 2016, request that the Government (Army) issue checks payable to both Redstick and the subcontractors."  *Id.* ¶ 77 (citing *Capitol Indem. Corp.*, 147 Fed. Cl. at 380).[3]  Moreover,

---

[2] The Court must first determine whether Plaintiff was equitably subrogated to the ninth progress payment, and, if so, the Court might only then need to consider whether the government abused its discretion in making that payment to Redstick instead of Plaintiff.  In other words, if the Court does not find equitable subrogation, the Court need not determine whether the government improperly paid *any* progress payments—whether in violation of the FAR or otherwise.

[3] Instead of weaving together in its argument section the factual predicates for such an apparent 'entitlement,' Plaintiff declares that "[t]his Court *has already held that Capitol is entitled* to equitable subrogation . . . ."  *Id.* ¶ 76 (emphasis added).  Plaintiff then matter-of-factly states "that the ninth progress payment made to Redstick was in the amount of $230,792.86," as if it were showing up here merely to cash its check.  *Id.* (citing *Capitol Indem. Corp.*, 147 Fed. Cl. at 380–81).  Plaintiff mistakes what Judge Firestone "held."  *Id*.  The issue(s) before Judge Firestone was the government's motion to

Plaintiff "allege[s] that these events occurred before the Government (Army) paid Redstick's ninth progress payment (Pay Request 9) on January 29, 2016, and that Capitol, therefore, is entitled to the ninth progress payment under the doctrine of equitable subrogation." *Id.* ¶ 78 (citing *Capitol Indem. Corp.*, 147 Fed. Cl. at 380–81) (emphasis omitted).

As these factual allegations/bases—and *only* these bases—permitted Plaintiff's equitable subrogation claim as to the ninth progress payment to survive dismissal under RCFC 12(b)(6), the Court weighs each allegation in turn. In weighing each of these allegations, the Court is guided by the Federal Circuit's instruction in *Lumbermens* that "[e]quitable subrogation can be used to recover improper payments to a principal obligor only if made after the obligee received notice of the principal obligor's default (i.e., notice that the bond obligation has been triggered and an implied assignment of the contract rights to the surety has occurred)." 654 F.3d at 1312; *see also Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 499 (Fed. Cir. 1990) ("Only when the surety may be called upon to perform, that is, only when it may become a party to the bonded contract, should the government owe it any duty. The surety knows best when this may occur; consequently, only notice by the surety triggers the government's equitable duty."). In other words, in order for Plaintiff to demonstrate that it is entitled to the ninth progress payment under equitable subrogation, it must demonstrate that the government was on notice that Redstick was in default.

### a.   Plaintiff's first ground for triggering equitable subrogation—the government informed Plaintiff that it "should be receiving Payment Bond claims"

Plaintiff has not met its burden of showing that its first alleged basis for asserting that the government was on notice of Redstick's default—that "the Government (Army) informed Capitol that it 'should be receiving Payment Bond claims,'" Pl.'s Partial Summ. J. Mot. ¶ 77—was a legally sufficient notice of default; therefore, this "notice" is insufficient to trigger Plaintiff's equitable subrogation rights. Plaintiff's argument on this theory stems from the allegation that "as of December 30, 2015," the government—via Roy Cantrell, a "contracting specialist" on the instant contract, Gov.'s Cross-Mot. Summ. J. at 3—"notified Capitol that it would be receiving Payment Bond claims from Redstick's unpaid subcontractors." Pl.'s Partial Summ. J. Mot. ¶ 29 (citing ECF No. 63-2 at 84 (Plaintiff's "Capitol4484")). Plaintiff alleges that, because "these events occurred before the Government (Army) paid Redstick's ninth progress payment (Pay Request 9) on January 29, 2016," Plaintiff "is entitled to the ninth progress payment under the doctrine of equitable subrogation." *Id.* ¶ 78 (emphasis omitted); *see also id.* ¶ 48 ("Capitol's request [for payment of joint checks] provided the Government further notice of Redstick's default although—in light of all that had already occurred, including without limitation *the Government's having put Capitol on notice of Redstick's default and of impending*

---

dismiss pursuant to RCFC 12(b)(1) and RCFC 12(b)(6), not a motion for summary judgment. Judge Firestone was not entering final judgment on Plaintiff's claims—except in dismissing those claims for which Plaintiff had failed to allege sufficient facts—and, in fact, closed her opinion by ordering the parties to file a joint status report and proposed discovery schedule "regarding the ninth progress payment," which survived the government's motion to dismiss. *Capitol Indem. Corp.*, 147 Fed. Cl. at 382. Plaintiff's *allegations* may be "enough to trigger [its] equitable subrogation rights," and thus survive dismissal under RCFC 12(b)(6), but Plaintiff still must demonstrate that it is entitled to a judgment as a matter of law on such allegations at the summary judgment stage. *Id.* at 381.

*Payment Bond claims*—adequate notice had already been provided." (footnote omitted) (emphasis added)).

The government counters that Plaintiff "resurrects theories squarely rejected in the Court's decision on our motion to dismiss." Gov.'s Cross-Mot. Summ. J. at 32.[4]  On this point, the Federal Circuit's analysis in *Fireman's Fund* is especially apt:

> Fireman's Fund did not notify the government of Westech's failure to pay its subcontractors and suppliers or ask that payments to Westech be withheld until December 22, 1983, almost five months after the government had fully released the retainage which Fireman's Fund now claims.  *That some subcontractors and suppliers had informed the government of Westech's payment deficiencies prior to the release of the retainage does not substitute for notice by the surety and does not trigger the government's equitable duty to act with reasoned discretion toward it.* Fireman's Fund simply cannot rely on Westech's subcontractors or the government to protect its interests.  By definition and agreement the surety protects the government's interest, not the other way around.
>
> *We see no reason to impose on the government a duty toward the surety whenever a subcontractor or supplier complains of late or nonpayment by the contractor*. . . . Only when the surety may be called upon to perform, that is, only when it may become a party to the bonded contract, should the government owe it any duty.  The surety knows best when this may occur; consequently, only notice by the surety triggers the government's equitable duty.

909 F.2d at 499 (emphasis added).

The Court need not beat around the bush on this first alleged ground for equitable subrogation, over which there is no dispute of material fact.  As Judge Firestone already made clear in this matter, "knowledge of a contractor's failure to make subcontractor payments alone does not constitute adequate notice to establish a claim for equitable subrogation . . . ." *Capitol Indem. Corp.*, 147 Fed. Cl. at 380 (citing *Fireman's Fund Ins. Co.*, 909 F.2d at 499).  To any extent this alleged ground could be more fruitful for Plaintiff if viewed in conjunction with Plaintiff's two other allegations, the Court considers (and disposes of) that theory further below. *See infra* Section B.1.d.

---

[4] The government also cites FAR 28.106-7 in support of its argument that the subcontractor payment bond claims did not constitute notice of default. *See id.* at 4 ("[E]ven when the Government substantiates complaints from subcontractors about payment, the FAR does not permit the Government to withhold progress payments on this basis during contract performance."); *id.* at 32.  The intended inference appears to be that, for the sheer fact that FAR 28.106-7 prohibits the withholding of contract payments on account of unpaid subcontractors, the unpaid subcontractors in the instant case cannot possibly evince a notice of default.  The government, however, cites no case standing for that kind of catch-all, FAR-specific proposition.

**b.      Plaintiff's second ground for triggering equitable subrogation—the government "suspended Redstick" on January 4, 2016**

Plaintiff asserted in its motion for summary judgment that its equitable subrogation rights "were triggered by the Government's (Army's) actions starting on December 30, 2015, when . . . the Government (Army) then 'suspended Redstick' on January 4, 2016 . . . ." Pl.'s Partial Summ. J. Mot. ¶ 77. The problem with this assertion, however, is that the Army did not in fact suspend Redstick's performance under the contract on January 4, 2016. For reasons explained in a separate opinion following an order instructing Plaintiff's counsel to show cause why RCFC 11 sanctions should not be issued, *see* ECF No. 83, Plaintiff moved to withdraw—and the Court permitted withdrawal of—its factual allegations concerning a suspension of Redstick's work on the contract "on or before January 4, 2016." *See* ECF No. 81 at 9–10; *see also* RCFC 11(b) ("By presenting to the court a . . . written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . ."). Therefore, the Court need not address this basis (nor may it serve as a basis) for the government allegedly being on notice of Redstick's default.

**c.      Plaintiff's third ground for triggering equitable subrogation—the government's receipt of Plaintiff's January 13, 2016, request for checks to be made payable to both Redstick and Redstick's subcontractors**

Plaintiff also fails to meet its burden to show that its third alleged basis put the government on notice of Redstick's default—that "the Government (Army) received Capitol's January 13, 2016, request that the Government (Army) issue checks payable to both Redstick and the subcontractors." Pl.'s Partial Summ. J. Mot. ¶ 77. This argument centers around a January 13, 2016, email from Patricia Framke, "a Claims Specialist for Cap Specialty, which is a trade name under which Plaintiff Capitol Indemnity Corporation ('Capitol') does business," ECF No. 63-2 at 1 (Plaintiff's "Exhibit '2'"), to contracting specialist Roy Cantrell. The email itself is undisputed, and both parties cite to the same, which in relevant part states:

> Hi Roy,
>
> Thank you for the update. I will contact Redstick and see if I can motivate them to get this moving forward.
>
> Could you provide us with a copy of the last approved payment application?
>
> We have received payment bond claims from CWS Services and Dakin Applied. Is it possible, going forward, to issue joint checks payable to both Redstick and their subcontractors?
>
> Thank you,
> Pat

ECF No. 63-2 at 34 ("Capitol3264"); ECF No. 68-1 at 64 (government's "A62"). Thus, all that remains in dispute is whether this email constitutes notice of default as a matter of law.

Taking the parties' arguments in turn, Plaintiff asserts that "[b]efore the Government issued payment pursuant to Pay Request 9, Capitol asked that joint checks be issued to ensure proper payment of Redstick's obligations under the Contract," and that "Capitol's request provided the Government further notice of Redstick's default although—in light of all that had already occurred, including without limitation the Government's having put Capitol on notice of Redstick's default and of impending Payment Bond claims—adequate notice had already been provided." Pl.'s Partial Summ. J. Mot. ¶ 48 (footnote omitted). The government counters that Plaintiff "did not assert any right to this payment, ask that it be withheld, or object after it learned that it had been disbursed"; that Plaintiff's "representative instead asked about the possibility of issuing joint checks to Redstick and subcontractors, without proposing any way of facilitating these joint checks, and without any record of following up after the email exchange"; and that "in this same email correspondence, [Plaintiff's] representative promised to reach out to Redstick to encourage it to work faster, demonstrating that [Plaintiff] intended to continue to rely upon Redstick to complete performance." Gov.'s Cross-Mot. Summ. J. at 31.

Reviewing the undisputed content of the January 13 email, the Court finds that Plaintiff's argument borders on the absurd.[5] Plaintiff points to no case law supporting the proposition that a surety merely *inquiring* whether it is "possible . . . to issue joint checks payable to both [the principal obligor] and their subcontractors"—and not to the surety itself in any fashion—satisfies the standard for notice by the surety of default and an assertion of rights. Rather, the cases on which Plaintiff relies signal the opposite. For example, the Federal Circuit, in *National American Ins. Co. v. United States*, upheld Judge Allegra's finding of equitable subrogation in a case in which the surety had "notified the government that no additional payments were to be made . . . and requested that all remaining contract funds be held for [the surety's] benefit." 498 F.3d 1301, 1303 (Fed. Cir. 2007); *see also id.* at 1305–06 ("[I]n *Balboa*, under facts similar to the present case, we held that a payment bond surety could sue the United States for damages occasioned when the government made progress payments to a contractor, despite having been notified by the surety that it had made payments to subcontractors . . . *and that payment should not be made without the surety's consent*." (emphasis added)). In *Balboa*, after the Claims Court granted summary judgment in favor of the government, the circuit remanded, for further

_____

[5] The undersigned recognizes that, at the motion to dismiss stage of this litigation, Judge Firestone was compelled to "accept as true all factual allegations in the complaint and . . . make all reasonable inferences in favor of the plaintiff." *Capitol Indem. Corp.*, 147 Fed. Cl. at 378 (citing cases). Accordingly, she took Plaintiff at its word in its amended complaint that Plaintiff had "requested the issuance of joint checks to ensure proper payment of obligations under the Contract thereby notifying Defendant of Redstick's default," and that "Defendant refused . . . and inexplicably paid Redstick directly." Amend. Compl. ¶ 31. Now, at the summary judgment stage, Plaintiff's clever draftsmanship is more apparent, with the undisputed email reflecting that Plaintiff's representative inquired only about the possibility of joint checks "to both Redstick and their subcontractors," not to Plaintiff itself as surety. ECF No. 63-2 at 34 ("Capitol3264"); ECF No. 68-1 at 64 (government's "A62"); *see also* ECF No. 24 at 7 (government's renewed motion to dismiss noting that "Capitol omits [from its amended complaint] that it requested that the Army issue 'joint checks' to Redstick and its subcontractors, not to Redstick and Capitol or to Capitol and Redstick's subcontractors").

consideration, a surety's claim for equitable subrogation where the surety "addressed a letter . . . to the Contracting Officer . . . *demanding that no further contract funds be released without its consent*.  A Government check in the amount of $23,163.50 was issued and disbursed to [the contractor] . . . nevertheless." 775 F.2d at 1160 (emphasis added).  Furthermore, the circuit's analysis in *Fireman's Fund* is equally instructive, finding that the surety "did not notify the government of Westech's failure to pay its subcontractors and suppliers *or ask that payments to Westech be withheld* until December 22, 1983, almost five months after the government had fully released the retainage which Fireman's Fund now claims." 909 F.2d at 499 (emphasis added).

Here, it is undisputed that Plaintiff did not direct the government to withhold payments to Redstick until at least March 3, 2016, more than a month after the ninth progress payment.  In fact, Plaintiff itself says as much: "the record shows that on March 3, 2016, Capitol asked Defendant to stop distributing progress payments to Redstick." Pl.'s Resp. & Reply ¶ 66; *see also* ECF No. 68-1 at 49 (government's "A47") (March 3, 2016, email from Framke to Cantrell stating, "[w]e ask that no further contract funds or retention be released to Redstick without Capitol Indemnity's express written permission").

Based on the above cited case law, it is clear that a surety asking the government to *continue making payments* to the principal obligor, Redstick—as Plaintiff did on January 13, 2016—is not notifying the government "of the principal obligor's default (i.e., notice that the bond obligation has been triggered and an implied assignment of the contract rights *to the surety* has occurred)." *Lumbermens*, 654 F.3d at 1312 (emphasis added).[6]  If Redstick had defaulted such that an implied assignment of contract rights to Plaintiff had or should have occurred, Redstick would no longer have an expectation of continued progress payments from the government.  Thus, asking the government to continue paying Redstick (even with the potential modification of joint checks to Redstick and its subcontractors) is legally insufficient to put the government on notice that Redstick was in default.  Plaintiff's request "made clear that it did *not* believe the funds should be distributed to Capitol Indemnity." ECF No. 76 at 3 ("Gov.'s Reply"); *see also id.* at 5 ("[Plaintiff's] email asking about the possibility of issuing joint checks to Redstick and subcontractors did not provide notice that [Plaintiff's] bond obligations had been triggered.  To the contrary, . . . this email chain made clear that [Plaintiff] was *not* seeking the

_____

[6] Throughout its briefing, Plaintiff places much weight on Judge Firestone's opinion denying in part the government's motion to dismiss. *See supra*, note 3.  It should be noted, however, that even Judge Firestone's opinion casts substantial doubt on Plaintiff's request-for-joint-checks theory, now that the undisputed content of the email—and its clear lack of any demand to withhold payment—is before the Court as evidence on summary judgment.  For example, in salvaging Plaintiff's claim as to the ninth progress payment, Judge Firestone directed the reader to:

> *See Balboa Ins. Co.*, 775 F.2d at 1160 (treating notice that the principal "was in financial straits and would not be able to fulfill its payment and performance obligations" and "*demanding that no further contract funds be released without its consent*" as sufficient notice of potential default); *Am. Fid. Fire Ins. Co. v. United States*, 513 F.2d 1375, 1377 n.1, 1380-81 (Ct. Cl. 1975) (finding a letter stating, "please consider this letter *formal demand* that any monies due under the above contract be forthwith distributed to and placed with [the surety]" as sufficient notice of default).

*Capitol Indem. Corp.*, 147 Fed. Cl. at 380 (alteration in original) (emphasis added).

funds disbursed in progress payment number nine." (citation omitted)).  But default by Redstick would mean that Plaintiff was stepping into Redstick's shoes and thus Plaintiff, and not Redstick, would be entitled to payment from the government.  Plaintiff's question to the government regarding the possibility of issuing joint checks simply is not notice to the government of Redstick's default.  This is especially the case given that elsewhere in the "notice" Plaintiff informs the government that Plaintiff is going to continue to push Redstick to perform.  *See* ECF No. 63-2 at 34 ("Capitol3264") and ECF No. 68-1 at 64 (government's "A62") ("I will contact Redstick and see if I can motivate them to get this moving forward.").

The Court also observes that Plaintiff is in rather familiar territory.  Years before the instant matter, in a separate contract dispute, Judge Firestone dismissed a claim by Capitol Indemnity for equitable subrogation, finding that it "had not explicitly notified the government of any default by [the principal obligor] at the time that the government made the [disputed] progress payments," even though a clause in the bonds at issue expressly directed that progress payments be made to an escrow company rather than the principal obligor.  *Capitol Indem. Corp. v. United States*, 71 Fed. Cl. 98, 103 (2006).  Plaintiff there cited *Transamerica Premier Ins. Co. v. United States*, 32 Fed. Cl. 308 (1994)—as it also does here, *see* Pl.'s Partial Summ. J. Mot. ¶ 72—in support of its claim for equitable subrogation.  In denying Plaintiff's claim, Judge Firestone reasoned that "plaintiff's reliance on [two other cases and] *Transamerica Premier Insurance Co. v. United States* . . . is misplaced," because, in contrast to Capitol Indemnity's allegations, "[i]n all three of those decisions, the surety, either itself or through the contractor, had *explicitly* notified the government of the contractor's default *and* had requested that *payments be made to the surety*."  *Capitol Indem. Corp.*, 71 Fed. Cl. at 104 (citation omitted) (emphasis added); *see also id.* ("Until the surety undertakes to protect *itself* by notifying the government of default and *requesting that progress payments be withheld*, the government is under no duty . . . to protect the surety's interests." (emphasis added) (citing *Fireman's Fund Ins. Co.*, 909 F.2d at 498)).

In the instant case, the undisputed content of the January 13th email—and even Plaintiff's formulation of its own argument—reflects that Plaintiff's representative asked that payments be made "to both Redstick and their subcontractors."  *See* Pl.'s Partial Summ. J. Mot. ¶ 77.  To paraphrase Judge Firestone's observation in 2006, Plaintiff has not established that it "explicitly notified the government of the contractor's default [and/or] requested that payments be made *to the surety*" prior to the ninth progress payment.[7]  *Capitol Indem. Corp.*, 71 Fed. Cl. at 104 (emphasis added).

For all these reasons, Plaintiff has not established, in light of the undisputed facts, that the communication of January 13, 2016, satisfies the legal threshold for notice to the government of the principal obligor's default or an assertion of the surety's rights to the contract.  Therefore, it is not entitled to summary judgment based on the January 13th email.

---

[7] "It was not until approximately six weeks later that [Framke] would ask that no additional payments be disbursed to Redstick—which shows that Capitol Indemnity knew how to ask that progress payments be withheld, when it wanted to."  Gov.'s Cross-Mot. Summ. J. at 31 (citing ECF No. 68-1 at 49 (government's "A47")).

### d. Even taken together, Plaintiff's bases for triggering equitable subrogation are insufficient

Finally, the Court must note that to the extent Plaintiff asserts that the totality of these two bases constitutes legally sufficient notice of Redstick's default, the Court finds such an assertion equally unavailing. *See, e.g.*, Pl.'s Partial Summ. J. Mot. ¶ 48 ("Capitol's request [that joint checks be issued] provided the Government *further* notice of Redstick's default . . . ." (emphasis added)). First and foremost, the Court will not adopt a rule whereby two "wrongs" (i.e., two independently insufficient grounds for equitable subrogation), when viewed together, create a "right" (to subrogation) at summary judgment. And Plaintiff points to no case law in support of such a scenario.

It is true that Judge Firestone in this matter held that "Capitol has *alleged* more than a failure to pay subcontractors. Rather, Capitol alleges that the Army's actions after December 30, 2015, *when taken together*, are sufficient to state a claim for equitable subrogation for the ninth progress payment." *Capitol Indem. Corp.*, 147 Fed. Cl. at 380 (emphasis added). In other words, Plaintiff's bare allegations, taken together, were "substantial enough to raise the right to relief 'above the speculative level,'" thus defeating dismissal. *Id.* at 378 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Yet, the undisputed facts at the summary judgment stage demonstrate that up until, and even after, the ninth progress payment was issued to Redstick, Plaintiff still operated as if it was not asserting its rights as the surety. Quite the opposite, in fact. Plaintiff's own summary judgment evidence—offered as proof that Plaintiff had "asked that joint checks be issued to ensure proper payment of Redstick's obligations under the Contract," Pl.'s Partial Summ. J. Mot. ¶ 48—reflects a surety still operating very much outside the role of principal obligor. *See* ECF No. 63-2 at 34 ("Capitol3264") (January 13, 2016, email from Capitol's Framke to contracting specialist Cantrell stating, "I will contact Redstick and see if I can motivate *them* to get this moving forward" (emphasis added)); *see also* ECF No. 68-1 at 63–64 (government's "A61–62") (Plaintiff's representative, on February 18, 2016, emailed the Army asking "[a]re there any updates on the completion of this project?"). These undisputed facts, along with Plaintiff's withdrawal of its contention concerning the January 4, 2016, email, do not support Plaintiff's grounds for summary judgment on the ninth progress payment, even when "taken together."

Accordingly, Plaintiff has not shown that it is entitled to judgment as a matter of law on any of the factual allegations that permitted Plaintiff's equitable subrogation claim to the ninth progress payment to survive dismissal.[8] Moreover, as there remains no material fact in dispute

---

[8] The Court generally concurs with the government, *see* Gov.'s Cross-Mot. Summ. J. at 35–36, that, at least as to Plaintiff's assertions that the government overpaid Redstick in contravention of the contract and the FAR, *see, e.g.*, Pl.'s Partial Summ. J. Mot. ¶ 46 ("[T]he payment of Pay Request 9 exceeded the 80% cap on progress payments imposed by the express terms of the Contract and of FAR clauses incorporated by reference or by full text into the Contract."), Plaintiff does not appear to move for summary judgment thereon. *See* Pl.'s Partial Summ. J. Mot. ¶¶ 76–86 (Plaintiff's arguments in support of summary judgment say nothing of an 80% cap on progress payments or anything of the sort). Nor does Plaintiff make clear what theory of liability it would even move on had it done so. *See Lumbermens*, 654 F.3d at 1314–15 ("While *pro tanto* discharge, as the government admits, may be asserted as a defense to a

as to whether Plaintiff provided sufficient notice to the government of Redstick's alleged default, the government is entitled to judgment as a matter of law on Plaintiff's equitable subrogation claim to the ninth progress payment.

### 2. Plaintiff's Claim, as Equitable Subrogee, for an Equitable Adjustment for Reinstalling the Gym Floor

Plaintiff next contends that, as Redstick's equitable subrogee, it is entitled to an "equitable adjustment" of $135,065.69 "for having to reinstall the Gym floor after the Government had already accepted and paid for Redstick's installation of that same floor . . . ." Pl.'s Partial Summ. J. Mot. ¶¶ 82, 84; *see also id.* at 28 ("*As Redstick's equitable subrogee*, Capitol is entitled to recover, as *an equitable adjustment to the contract*, the money it had to expend in reinstalling the gym floor.") (capitalization removed; emphasis added).  In ruling on the government's RCFC 12(b)(6) motion as to this count, Judge Firestone reasoned,

> taking Capitol's allegations to be true, that Capitol has stated a claim for $135,065.69 based on the theory of a contract adjustment.  The government's argument that the Takeover Agreement precludes Capitol's claim is contradicted by Capitol's factual allegations that Capitol was not relinquishing a claim for *reinstalling* the gym floor after Capitol learned that the gym floor work had been accepted and paid for by the Army while Redstick was performing.

*Capitol Indem. Corp.*, 147 Fed. Cl. at 381.  Accordingly, she denied dismissal of the gym floor claim, leaving the factual debate for the summary judgment stage.  *See id.*  In so doing, however, Judge Firestone observed in a footnote that "Capitol's gym floor claim is raised *under the doctrine of equitable subrogation rather than the CDA* because it occurred after Redstick's default but *prior to the Takeover Agreement*." *Id.* at 381 n.9 (emphasis added).[9]  For reasons explained below, this distinction is an important one.

As an initial matter, it is important to identify exactly what money Plaintiff is bringing this equitable subrogation claim against.  Said differently, the first question is: from what contract, agreement, or theory does Plaintiff derive its claim for an equitable adjustment related to the gym floor?  This is important to establish, because, as a general matter, "equitable subrogation is based on the view that the triggering of a surety's bond obligation gives rise to an

---

government claim asserted under a bond, the problem here is that Lumbermens is asserting the theory of impairment of suretyship not as a defense, but as an affirmative cause of action. . . .  [T]he United States has not waived sovereign immunity as to such claims.").

[9] The government appears to partially dispute Judge Firestone's choice of wording, suggesting that "any [gym floor] claim Capitol Indemnity had arose no later than January 28, 2016, when the United States informed Redstick that its work on the gymnasium floor was nonconforming."  Gov.'s Cross-Mot. Summ. J. at 28 n.4.  Nonetheless, the government agrees that "[e]ven if a claim had arisen after Redstick was terminated, there would be no basis to recover under a theory of equitable subrogation, as the United States did not disburse any money to Redstick after progress payment number nine.  As a result, there would be no money for Capitol to recover."  *Id.*  Thus, Plaintiff, the government, and Judge Firestone all agree that Plaintiff brings its equitable adjustment claim as one arising out of its alleged status as Redstick's equitable subrogee, rather than as one in direct contractual privity with the government (such as via the Takeover Agreement).

implied assignment of rights by operation of law whereby the surety 'is subrogated to the [principal obligor's] *property rights in the contract balance.*'"  *Lumbermens*, 654 F.3d at 1312 (quoting *Balboa*, 775 F.2d at 1161) (alteration in original) (emphasis added).  Relatedly, "equitable subrogation permits a surety to recover *improper payments*[, but] only if made after the obligee was on notice of the principal obligor's default." *Id.* at 1313 (emphasis added); *see also Balboa*, 775 F.2d at 1161  ("When a contractor defaults under the contract, the obligation of the surety then arises under its performance and payment bonds.  When the surety then finances the contract to completion, it is subrogated to the contractor's property rights in the *contract balance.*" (citing cases)).

In other words, there is only a limited right of recovery against the government by a surety that is equitably subrogated to a contractor.  This makes sense, because "under the doctrine of equitable subrogation, the surety 'step[s] into the shoes of [the] government contractor' and may bring suit under the Tucker Act based on the *contractor's* privity with the United States under the . . . contract." *Lumbermens*, 654 F.3d at 1312 (quoting *Ins. Co. of the W.*, 243 F.3d at 1369, 1374–75) (alterations in original) (emphasis added).  In short, as an equitable subrogee, the surety takes on the rights of the contractor—nothing more.  *See Hartford Fire Ins. Co. v. United States*, 108 Fed. Cl. 525, 534 (2012) ("It is . . . a general principle of equitable subrogation that 'one cannot acquire by subrogation from another, rights which that person did not have.'") (quoting *Ram Constr. Co., Inc. v. Am. States Ins. Co.,* 749 F.2d 1049, 1055 (3d Cir.1984)); *see also Colonial Sur. Co. v. United States*, 108 Fed. Cl. 622, 634 (2013) ("A surety that is equitably subrogated to the rights of a contractor can seek to recover from the government *either* 'contract funds still held by the Government as retainage' *or* 'contract funds [that] had been disbursed to the contractor after the surety notified the Government of the contractor's default.'" (quoting *Ins. Co. of the W.*, 83 Fed. Cl. at 538) (emphasis added)).

This means that beyond the contract retainage, or an improperly disbursed progress payment, there is little else recoverable solely under the theory of equitable subrogation.  For instance, in *Universal Sur. Co. v. United States*, Judge Bruggink wrestled with the "novel" question of: "does a surety have the right to assert, independently of the contractor, claims against the government for amounts other than the 'contract price?'" *Universal Sur. Co. v. United States*, 10 Cl. Ct. 794, 794 (1986).  In that case, the government argued that "since the doctrine of subrogation is limited to claims against retained funds, plaintiff has no right to make claims for a price adjustment in the construction contract." *Id.* at 796.  Relying on *Balboa* and other cases, Judge Bruggink reasoned that "if plaintiff were asserting an interest only in amounts retained by the government from the contract price, it would be clear that it has the right to proceed before this court . . . under a theory of equitable subrogation," and "[s]imilarly, it would have the right to seek to recover the amount of a progress payment alleged to have been improperly paid." *Id.* at 797 (citing cases).

Later, in *Transamerica Ins. Co. v. United States*, the Federal Circuit further summarized *Universal Sur. Co.* as follows, highlighting the possibility that an adjustment claim sought first by the contractor before default might pass to the surety as equitable subrogee:

> In *Universal Surety,* the surety brought an action in the [Claims Court] against the government.  The surety, after fulfilling its obligations (under performance or

payment bonds or both) when the contractor became financially unstable, tried to claim not only funds retained by the government from the contract price, but also additional expenses from the government in excess of the contract price. However, there was no written agreement allowing the surety to take over the project, and the contractor in fact stayed on the job and completed its work. *Moreover, the contractor never sought an adjustment to the contract price for the additional expenses incurred by the surety.* The [Claims Court] held that the surety was entitled to the contract funds retained by the government, but that, *absent a claim by the contractor for an adjustment to the contract price, the surety was not entitled to subrogation of the right of the contractor to seek an adjustment to the contract price for extra expenses incurred*.

989 F.2d at 1193–94 (emphasis added) (citations omitted). It is also true that "excess costs" have been found awardable to a completing surety, though such costs were specifically provided for as extra work in a "written agreement between the surety and the defendant . . . ." *Carchia v. United States,* 202 Ct. Cl. 723 *(*1973*)*; *Universal Sur. Co.*, 10 Cl. Ct. at 799 ("[In *Carchia*], the Court of Claims allowed a *completing* surety to claim payment for extra work *beyond that contemplated in the original contract price*." (emphasis added)).

With all the above in mind, the Court grapples with the allegations contained in Plaintiff's somewhat muddled briefing. Lest it need repeating, Plaintiff brings its gym floor equitable adjustment claim under the theory of equitable subrogation; it does not allege that it brings its claim for an adjustment via the CDA. *See, e.g.*, Pl.'s Partial Summ. J. Mot. ¶ 2 ("Capitol asserts *inter alia* two equitable subrogation claims: (a) a claim for damages for the Government's improper release of progress payments to Redstick . . . ; and (b) a claim for equitable adjustment under FAR 252.243-7002, for Capitol's having to reinstall flooring in the Iron Horse Gym Building . . . at the Fort Hood in Killeen, Texas ('Fort Hood'). *Capitol also seeks damages pursuant to the Contract Disputes Act ('CDA')* . . . for *Redstick's* additional work on the Gym's heating, ventilating, and air conditioning ('HVAC') systems, for which Redstick was not paid." (footnotes omitted) (emphasis added)). This was, perhaps, by deliberate choice. *See Lumbermens*, 654 F.3d at 1321 ("[A] surety does become a 'contractor' within the meaning of the CDA when it enters into a takeover agreement, and the CDA applies to any post-takeover claims arising out of that agreement."); *see also* Gov.'s Cross-Mot. Summ. J. at 38 n.7 ("Although Capitol Indemnity purports to bring [the gym floor] claim under a theory of equitable subrogation, a claim related to 'additional work' would also be barred if it were brought under the CDA. The claim is barred both under the election doctrine and because it was not assigned from Redstick to Capitol Indemnity, as would be required to assert a CDA claim."). But while a hypothetical equitable adjustment claim pursuant to the CDA may or may not have proved successful for Plaintiff, its claim for an adjustment on the theory of equitable subrogation falls flat, because Plaintiff has not established that it can prosecute its equitable adjustment claim solely in its capacity as an alleged equitable subrogee. Plaintiff's claim for additional work is neither based on a right obtained by stepping into Redstick's shoes nor pled as a contractual dispute (i.e., CDA) over the Takeover Agreement. *See Capitol Indem. Corp.*, 147 Fed. Cl. at 381 n.9 ("Capitol's gym floor claim is raised under the doctrine of equitable subrogation rather than the CDA because it occurred after Redstick's default but prior to the Takeover Agreement.").

20

Unlike the scenario contemplated in *Transamerica Ins. Co.* and *Universal Sur. Co.*, there is no allegation here that the contractor, Redstick, made a claim for an adjustment—it could not have, as the repair work was performed after Redstick was terminated.  Thus "the surety [is] not entitled to subrogation of the right of the contractor to seek an adjustment to the contract price for extra expenses incurred."  *Transamerica Ins. Co.*, 989 F.2d at 1193–94 (summarizing *Universal Sur. Co.*) (citations omitted).  Stated differently, Plaintiff has not pointed to any controlling precedent in which a surety *as equitable subrogee* could successfully maintain an equitable adjustment claim against the government for amounts above and beyond the contract price that was *neither* (1) first pursued by the contractor itself prior to default, nor (2) derived from a constructive change in or assigned by a takeover agreement itself, and thus, brought pursuant to the CDA.  The "additional work," Pl.'s Resp. & Reply ¶ 73, completed by Plaintiff did not occur until after it had assumed responsibility for completing the project; therefore, it could not be a Redstick claim for adjustment that Plaintiff might now prosecute under an equitable subrogation theory.  While case law may, in limited circumstances, leave room for equitable subrogation to claims beyond just improper payments and contract retainage, Plaintiff certainly cannot proceed on a claim as *equitable subrogee* to which it was not equitably subrogated.

To the extent that Plaintiff's equitable adjustment claim can be construed as being tied to its pursuit of the ninth progress payment, Plaintiff has similarly failed to establish that it is so entitled.  *See, e.g.*, Gov.'s Cross-Mot. Summ. J. at 27 ("Capitol Indemnity brings two claims based on the doctrine of equitable subrogation.  Although Capitol Indemnity's briefing does not acknowledge this, both claims are based on the same premise: that Capitol Indemnity had priority over Redstick to progress payment number nine at the time it was disbursed. . . . [T]he funds disbursed in progress payment number nine are the only funds Capitol Indemnity can seek through the doctrine of equitable subrogation.").  In the preceding section, the Court determined that Plaintiff is not entitled to summary judgment on its equitable subrogation claim to the ninth progress payment.

Furthermore, it is undisputed that, at the time of the Takeover Agreement, the contract balance was $230,792.85, "which is 10% of the Original Contract,"  ECF No. 68-2 at 79 (government's "A157"), and that Plaintiff received this remaining contract balance after it completed the remaining work on the project, *see* Gov.'s Cross-Mot. Summ. J. at 28 ("[T]he takeover agreement provided for Capitol Indemnity to recover the entire contract balance of $230,792.85 upon completing the project, which it did.") (citing ECF No. 68-1 at 5 (government's "A3") and ECF No. 68-2 at 79 (government's "A157")); Gov.'s Reply at 2 ("Capitol Indemnity cites nothing to dispute the evidence indicating that Capitol Indemnity received the contract balance that remained after progress payment number nine was disbursed.").  Accordingly, there is nothing left for Plaintiff to claim by way of equitable subrogation.  *See* Gov.'s Cross-Mot. Summ. J. at 28 ("Besides progress payment number nine, the only amounts that Capitol Indemnity does not already possess that it could conceivably seek *under the equitable subrogation doctrine* would be prior progress payments—but the Court

dismissed claims related to those prior progress payments in response to our motion to dismiss." (emphasis added)).[10]

Finally, by its own pleadings and motion, it is clear that Plaintiff does not seek its equitable adjustment via the Takeover Agreement. *See, e.g.*, Amend. Compl. ¶ 38 ("[T]he Takeover Agreement was specifically negotiated to permit the assignment and reservation of claims *arising prior to the default of Redstick for the benefit of CAPITOL*." (emphasis added)). Rather, Plaintiff pursues its "equitable adjustment to the contract" via its alleged status "as Redstick's equitable subrogee." *See* Pl.'s Partial Summ. J. Mot. at 28 (capitalization removed); *see also id.* ¶ 52 ("Capitol removed the rubber Gym flooring that Redstick had previously installed, re-floated the entire concrete floor over which the rubber flooring had previously been installed, reinstalled the rubber flooring, and did whatever else was required to make the floor satisfactory to the Government.  Capitol incurred costs of $135,065.69 in doing this work, which constituted an equitable adjustment *to the Contract*." (emphasis added)).  But Plaintiff could only successfully make such a claim if it could further prove that the Army accepted Redstick's work on the gym floor and then later required an adjustment to that work.  In other words, for this claim, Plaintiff stands in Redstick's shoes—if Redstick would not have a claim for the gym floor work, then neither does Plaintiff.  And Redstick could not have a claim for an equitable adjustment for costs incurred in repairing its own deficient work.  *See also* ECF No. 68-2 at 85 (government's "A163") (Takeover Agreement's Exhibit A, concerning patent defects, provides that the "[f]loor surface below rubber flooring will be floated to ensure a flat, smooth look. Remove rubber flooring, float floor, and re-install rubber flooring.").

The Court finds that Plaintiff has not established that the Army "accepted" Redstick's work, nor has it established a dispute of material fact on the question.  Although Plaintiff began with an argument that the government "had already accepted and paid for Redstick's installation of [the gym] floor," Pl.'s Partial Summ. J. Mot. ¶ 82, it did not in its reply brief rebut any of the government's factual assertions that Plaintiff's "claim is based upon the *false* premise that the Government accepted Redstick's work on the gymnasium floor, and then required Capitol Indemnity to re-do this already accepted work," Gov.'s Cross-Mot. Summ. J. at 37 (emphasis added).  For example, Plaintiff raises no evidence contesting the government's assertion in its cross-motion that Neta Singley was "the only Government employee with authority to accept the installation of the gymnasium floor," nor any evidence contesting the government's assertion that Singley did not accept Redstick's work on the gym floor.  *Id.*  Acceptance is directly relevant to Plaintiff's adjustment claim, Amend. Compl. ¶ 32 ("Defendant accepted the installation of the floor . . . .  Thereafter, the Defendant complains that such work was deficient and seeking to compel the performance of such work by CAPITOL without paying for the same."), and yet Plaintiff offers nothing to dispute the government's factual assertions of non-acceptance. *See* Gov.'s Reply at 10 ("Capitol Indemnity's opposition does not contest our showing that the

_____

[10] The Court suggests that Plaintiff's equitable subrogation claim for an equitable adjustment for its own work on the gym floor perhaps should have, in fact, been dismissed at the motion to dismiss stage.  Plaintiff did not allege that Redstick was entitled to an equitable adjustment for work on the gym floor, and the Court will not string together Plaintiff's other allegations to backfill its failure to do so.  Perhaps, Plaintiff might have had *some* claim to an adjustment that would have survived a motion under RCFC 12(b)(6) (i.e., a claim for an equitable adjustment to the Takeover Agreement pursuant to the CDA), but Plaintiff has not alleged such a claim here.

Government never accepted Redstick's work. As a result, it is unable to prevail on the [equitable adjustment] theory that survived our motion to dismiss.").

Moreover, to the extent Plaintiff alleges that "Defendant should never have approved payment of Contract funds to compensate Redstick for the work it did on the Gym floor," Pl.'s Resp. & Reply ¶ 94, or that "Defendant should have issued a Stop Work Notice before the rubber flooring was installed by Allied Products," *id.* ¶100—allegations that did not appear in its motion for summary judgment—Plaintiff cites nothing in support of its assertions. In other words, while it might have been prudent for the Army to withhold payment or issue a stop work order, Plaintiff has not shown that the government's alleged failure to do so creates a remediable injury to Plaintiff. In fact, its allegations hew most closely to a claim of *pro tanto* discharge, for which there is no jurisdiction in this Court as an affirmative cause of action. *See Lumbermens*, 654 F.3d at 1314–15 ("While *pro tanto* discharge, as the government admits, may be asserted as a defense to a government claim asserted under a bond, the problem here is that Lumbermens is asserting the theory of impairment of suretyship not as a defense, but as an affirmative cause of action. . . . [T]he United States has not waived sovereign immunity as to such claims.").

In sum, Plaintiff's claim for an equitable adjustment for the gym floor work is without a leg on which to stand. Plaintiff has not established there is any money from which to subrogate this claim, and, even if such remaining contract funds existed, Plaintiff has not disputed the government's factual showing that the gym floor work was never accepted (and thus that Redstick had a claim for which Plaintiff could step into Redstick's shoes as an equitable subrogee). Accordingly, the government is entitled to judgment as a matter of law on Plaintiff's gym floor claim.[11]

### 3.  Plaintiff's CDA Claim for an Equitable Adjustment for HVAC Work

Finally, Plaintiff asserts a breach of contract claim under the CDA against the United States for $94,847.10, Am. Compl. ¶¶ 63–68, arguing that "[t]he Contracting Officer demanded and directed changes and/or modifications to the work and/or scope of the work on the Project by the HVAC subcontractor failing to pay for the same and obtaining a release without consideration from Redstick," *id.* ¶ 65. *See also* Pl.'s Partial Summ. J. Mot. ¶ 2 ("Capitol also seeks damages pursuant to the [CDA] for Redstick's additional work on the Gym's heating, ventilating, and air conditioning ('HVAC') systems, for which Redstick was not paid."). Plaintiff, however, did not move for summary judgment on its HVAC claim, because, according to Plaintiff, "that claim involves disputed fact issues requiring trial on the merits." Pl.'s Partial Summ. J. Mot. ¶ 7. Plaintiff alleges that the HVAC claim was assigned to it by Redstick, via the General Indemnity Agreement, and that the government assented to this assignment in the Takeover Agreement. *See* Amend. Compl. ¶ 38 ("CAPITOL specifically negotiated and executed the Takeover Agreement to preserve all rights arising under the Contract and afforded to both CAPITOL, but also to Redstick; i.e., the Takeover Agreement was specifically negotiated to permit the assignment and reservation of claims arising prior to the default of Redstick for the benefit of CAPITOL.").

---

[11] The government is correct that even if the facts supported Plaintiff's theory that a change occurred to the contract, any equitable adjustment claim that arose after the Takeover Agreement would have to be brought under the CDA, not under equitable subrogation. Gov.'s Reply at 11.

The government, in its cross-motion, seeks summary judgment on this claim, arguing that it "suffers from two procedural defects: (1) Capitol Indemnity has failed to establish that this claim was validly assigned to it," thus allegedly running afoul of the Anti-Assignment Act, 31 U.S.C. §§ 3727(a)(1) and (b), and "(2) Capitol Indemnity has failed to provide a credible excuse for the belated submission of the notice [of the claim] required by FAR 52.243-4." Gov.'s Cross-Mot. Summ. J. at 39.[12]  In denying the government's motion to dismiss the HVAC claim, Judge Firestone reasoned that

> [t]he legality of any assignment to Capitol from Redstick and thus whether this court has jurisdiction to hear Capitol's claim is properly construed as a challenge to the facts alleged in the complaint that the Army assented to the assignment of Redstick's claims.  In addition, whether Redstick complied with the FAR and preserved a claim for payment or released the claim for additional HVAC work requires the court to consider evidence outside the complaint including the releases themselves.  As with Capitol's claim regarding the gym floor, these are matters that cannot be resolved on this motion to dismiss and the government's argument is appropriate only in a motion for summary judgment.  Finally, the government's argument that Capitol failed to state a claim because there is no allegation that Redstick provided notice within the requisite time period under FAR 52.243-4 is unpersuasive at this stage of the litigation.  Here, Capitol has alleged that the Army waived the notice requirement because it explicitly told subcontractors that a claim for the additional HVAC work could be brought at a later time.

*Capitol Indem. Corp.*, 147 Fed. Cl. at 382 (citations and footnote omitted).  It is undisputed that the work was performed while Redstick (not Plaintiff) was in privity with the government, *see, e.g.*, Pl.'s Resp. & Reply ¶ 110, and as Plaintiff brings this claim pursuant to the CDA, the Court first examines the "legality of the assignment" to Plaintiff, as Judge Firestone observed.

"[T]he Assignment of Claims Act, 31 U.S.C. § 3727(a)(1)-(b) is generally read in conjunction with the Assignment of Contracts Act, 41 U.S.C. § 6305(a) (formerly 41 U.S.C. § 15(a)).  Taken together, these two statutes—referred to collectively as the 'Anti–Assignment Acts'—bar the assignment of a claim against the government, a government contract, or some lesser or future interest in a government contract, subject to certain exceptions." *Anchor Sav. Bank, FSB v. United States*, 121 Fed. Cl. 296, 323–24 (2015) (citing *Fireman's Fund*, 313 F.3d at 1349).  Subsection (b) of § 3727 provides:

> An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued.  The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses.  The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment.

---

[12] The government raises two other grounds in opposition to Plaintiff's HVAC claim: that the claim is barred by the election doctrine, and that Redstick released the claim.  *Id.* at 41–44.  Because the Court determines that the claim, if there even was one, was not validly assigned, the Court does not reach the government's other grounds supporting dismissal of the HVAC claim.

The certificate shall state that the official completely explained the assignment when it was acknowledged.  An assignment under this subsection is valid for any purpose.

31 U.S.C.A. § 3727(b).  There is no allegation in the instant case that the alleged assignment "[was] allowed, the amount of the claim [was] decided, and a warrant for payment of the claim ha[d] been issued."  *Id.*  Accordingly, to defeat the government's cross-motion for summary judgment on the HVAC claim, Plaintiff must at least raise a dispute of material fact concerning whether the government waived the Act's general prohibition against—or assented to—the assignment of a claim.  *See Delmarva Power & Light Co. v. United States*, 542 F.3d 889, 893 (Fed. Cir. 2008) ("We see no valid reason why the government should not also be able to waive the Anti–Assignment Act's prohibition in section 3727(a) against the assignment of claims.").

Plaintiff asserts that the Anti-Assignment Act does not bar its HVAC claim, because: (1) of "the unambiguous terms of the Takeover Agreement, to which Defendant consented, and from which Defendant benefitted," Pl.'s Resp. & Reply ¶ 112; (2) "Defendant . . . acknowledged *inter alia* that Capitol is entitled to all of Redstick's rights, title, and interests arising under the Contract, as if Capitol had been an original party to the Contract," *id.* ¶ 114; and (3) the Takeover Agreement's "reference to 'all of former Contractor's . . . claims for equitable adjustment to the Contract price or time under the subject Contract, whether arising prior to or after the default,' clearly encompasses the claims for Redstick's work on the Gym's HVAC system, for which Redstick was never paid," *id.* ¶ 115.[13]  The question, therefore, is whether these allegations create a dispute of material fact to defeat summary judgment in favor of the government.

---

[13] Similarly, Plaintiff's amended complaint asserts:

The provisions of the Anti-Assignment Act do not bar recovery by CAPITOL because:

  a.  Defendant has clearly and unambiguously assented to the assignment of claims by novation under the same terms of the Contract to CAPITOL in the execution of contract no. W91151-14 C-0042 to CAPITOL for completion of the Project;

  b.  Defendant has clearly and unambiguously assented to the assignment of claims by execution of the Takeover Agreement and incorporation of paragraph 13 which specifically reserves all rights of CAPITOL and Redstick as acknowledged by Defendant, and provided that the Defendant consented to the assignment of Redstick's claims to CAPITOL; and

  c.  Assignment occurs by operation of law as CAPITOL is the completing surety entitled and is therefore equitably subrogated to all rights arising under the Contract.

Amend. Compl. ¶ 64.  Furthermore, Plaintiff alleges that "[i]t was further represented to CWS Services and Redstick that a claim could be submitted at a later date for the [HVAC-related] 'Additional Work[.]'" *Id.* ¶ 65.

In support of summary judgment on the HVAC claim, the government cites two cases, *United Pac. Ins. Co. v. Roche*, 380 F.3d 1352 (Fed. Cir. 2004), and *Tuftco Corp. v. United States*, 222 Ct. Cl. 277 (1980), for the proposition that Plaintiff has not shown the language in the Takeover Agreement to be sufficient for purposes of the government recognizing an assignment of the HVAC claim from Redstick to Plaintiff. *See* Gov.'s Cross-Mot. Summ. J. at 39–40; Gov.'s Reply at 12.

*Tuftco* "involv[ed] the assignment to plaintiff of contracts for the purchase of mobile homes by the Department of Housing and Urban Development (HUD)," and the government, "though it was aware of and recognized assignment of the contracts from the original contractor to plaintiff, nevertheless wrongfully forwarded some of the payments due under the contracts to the original contractor, resulting in plaintiff's loss." 222 Ct. Cl. at 279 . The government therein tried to hide behind the Anti-Assignment Act (specifically, the former 41 U.S.C. § 15), contending that the contracting officer did not have the authority to recognize the assignments. The Court of Claims, however, reiterated the "long-recognized principle that '[d]espite the bar of the Anti-Assignment statute (41 U.S.C. § 15), the Government, if it chooses to do so, may recognize an assignment.'" *Id*. at 285 (citing cases). In assessing the validity of the assignment (or, in other words, a waiver of the Anti-Assignment Act), the Court of Claims focused on "whether in this case the actions of the Government, manifested primarily by the contracting officer . . . indicated its consent to and recognition of the assignments." *Id.* The court ultimately found a waiver of the Anti-Assignment Act, as the facts "provide[d] ample support for the conclusion the Government *was aware of, assented to, and recognized the assignments*." *Id.* (emphasis added). For example, prior to each assignment, representatives for the assignor and assignee contacted the contracting officer "for his advice on the validity of the proposed assignments. They were assured by [the contracting officer] that despite the Anti-Assignment Act, the assignments were proper and would be recognized by HUD, with payment going to Winchester as contemplated." *Id.* Subsequently, the representatives sent written notification of the assignment to the contracting officer, and the contracting officer wrote "[a]ssignment acknowledged" on another piece of correspondence. *Id.* at 287. The Court, accordingly, found assent to the assignment, opining that "[a]ny doubts on this score are dispelled by the Government's actions consistent with its demonstrated awareness and acknowledgement of the assignments." *Id.* Furthermore, "the totality of the circumstances presented to the court establishes the Government's recognition of the assignments by its knowledge, assent, and action consistent with the terms of the assignments." *Id.*

More recently, in *Roche*, a surety that issued performance and payment bonds to, and ultimately completed performance on behalf of, a defaulting construction contractor sought an equitable adjustment from the government at the Armed Services Board of Contract Appeals ("Board"). 380 F.3d at 1354. Prior to the contractor's default, the surety and contractor had "executed an indemnity agreement in which [the contractor] assigned to [the surety], in case of [the contractor's] default, all of its 'rights . . . [and] claims . . . arising from or out of' the construction contract, including 'all moneys due' thereunder." *Id.* The Board held that it did not have jurisdiction over most of the surety's equitable adjustment claims, in light of the Federal Circuit's decision in *Fireman's Fund*, and the circuit affirmed. *Id.* at 1355; *see also id.* at 1356 ("In this case, the only contract between [the surety] and the government was the takeover agreement. Prior to that agreement, there was no contract between [the surety] and the

government, and [the surety's] present claims cannot have arisen under such a contract.  Stated differently, the Board had no jurisdiction over [the surety's] claims that were based upon events that occurred prior to the takeover agreement.").  Particularly compelling here, the circuit reasoned that:

> [The surety] argues . . . that [the contractor's] assignment in the indemnity agreement of all claims arising under the construction contract in case of default included the claim of contract illegality it now asserts.  *Fireman's Fund* held that the Anti–Assignment Act covered and invalidated such assignment of claims to a surety.  313 F.3d at 1349–50.  [The surety] invokes an exception to that Act for situations where the "Government . . . chooses to . . . recognize an assignment."  *Tuftco Corp. v. United States,* 222 Ct. Cl. 277, 614 F.2d 740, 745 (1980) (internal quotation marks omitted).  It asserts that the government recognized the assignment when it entered into the takeover agreement with [the surety].  Without discussing the issue in detail, it suffices to say that we discern *nothing in the takeover agreement that shows a government recognition of the assignment in the earlier indemnity agreement* between [the contractor] and [the surety], to which the government was not a party.

*Roche*, 380 F.3d at 1357 (emphasis added).

In similar fashion here, the Court finds nothing in the Takeover Agreement that "shows a government recognition of the assignment in the earlier indemnity agreement" between Plaintiff and Redstick.  To be sure, the Takeover Agreement in this matter provides the following:

> Owner hereby acknowledges and consent [sic] to the assignment of all former contractor's claims to Surety under the contract, to the extent permitted by law, including but not limited to, the right of Surety to assert, in its own name and for its own benefit, all of former Contractor's and any of Contractor's subcontractor's claims for equitable adjustment to the Contract price or time under the subject Contract, whether arising prior to or after the default.

*See* Pl.'s Partial Summ. J. Mot. ¶ 59; *see also* Gov.'s Cross-Mot. Summ. J. at 15 (citing ECF No. 68-2 at 82 (government's "A160")).  Plaintiff, in its reply brief, contends that "[t]he reference to 'all of former Contractor's . . . claims for equitable adjustment to the Contract price or time under the subject Contract, whether arising prior to or after the default,' clearly encompasses the claims for Redstick's work on the Gym's HVAC system, for which Redstick was never paid."  Pl.'s Resp. & Reply ¶ 115.  However, as a matter of law and consistent with the circuit's decision regarding an analogous situation in *Roche*, the Court does not find that this boilerplate language—sweeping in scope as it may be—overcomes the default statutory prohibition against the assignment of claims against the government or interests in a government contract.  Nor does it track with the cited circumstances in which cases in this Court and the Federal Circuit have previously found a government waiver of the Anti-Assignment Act.

To begin with, the language in the Takeover Agreement itself recognizes that only those assignments "permitted by law" are contemplated.  Generally, assignments of interests in a

government contract are not "permitted by law," as 41 U.S.C § 6305(a) makes abundantly clear: "The party to whom the Federal Government gives a contract or order may not transfer the contract or order, or any interest in the contract or order, to another party." To the extent that the circuit has recognized the ability of the government to waive the prohibition(s) of claim or contract assignment, the Court in this instance sees no such waiver—or at least one that comports with the type of knowing waiver or acknowledgment in the above-cited case law.[14] And Plaintiff has pointed the Court in no other direction.

Comparing Plaintiff's allegations with those in *Tuftco* reveals a rather stark contrast. Recall, in *Tuftco*, the parties were in communication with the contracting officer specifically regarding the validity of their purported assignment, on which the contracting officer expressly signed off. 222 Ct. Cl. at 286–87. Here, however, Plaintiff points only to the boilerplate language in the Takeover Agreement, which itself does not acknowledge with any degree of specificity any of Plaintiff's alleged rights to seek an equitable adjustment on behalf of Redstick. *See* Gov.'s Cross-Mot. Summ. J. at 40–41 ("The Federal Circuit has rejected the argument that boilerplate such as this is sufficient to recognize the assignment of a claim. . . . Like the takeover agreement that did not effect an assignment of the contractor's claims in *Roche*, the takeover agreement at issue here did not mention the indemnity agreement . . . and did not identify the HVAC-system-related claim . . . ."). Nor has Plaintiff attempted to rebut the government's factual assertion that "the contracting officer did not learn that Capitol believed this claim had been assigned to it until she received Capitol's certified claim." *Id.* at 41.

Moreover, Plaintiff has made no attempt to show that the alleged assignment in the indemnity agreement—which predates Redstick's work on the project—was even valid itself. *See Fireman's Fund Ins. Co.*, 313 F.3d at 1349 ("The assignment by Summit of 'all of their rights under the contracts' violated the prohibition in 41 U.S.C. § 15(a) against the transfer of 'any interest' in any contract involving the United States. At the time the assignment of the claims was made, no claims had been allowed. Indeed, any claims against the United States arising from a default in the construction contract had not even arisen. Under Section 3727(a)(1)(b), the assignment of those claims in the General Indemnity Agreement was invalid."). The Court notes that the General Indemnity Agreement between Plaintiff and Redstick was executed on September 12, 2014—some fifteen days *before* Redstick was even awarded the contract. *See* Pl.'s Partial Summ. J. Mot. ¶¶ 9, 11. Accordingly, what "claims" might Redstick have possibly assigned to Plaintiff?

---

[14] Although not mentioned or cited in any of Plaintiff's briefing on summary judgment, Plaintiff's amended complaint alleges that, "[i]n negotiating the Takeover Agreement, counsel for CAPITOL specifically advised counsel for Defendant that CAPITOL sought to '. . . reserve any rights . . .' by correspondence dated April 21, 2016. Counsel for the Defendant responded, 'Got It!' on the same date." Amend. Compl. ¶ 39. Even accepted as true, the government's rather flippant response is quite unlike the detailed correspondence in *Tuftco* that was held sufficient for a waiver of the Anti-Assignment Act. And even if it were, by failing to raise any argument related to this correspondence in its summary judgment briefing, Plaintiff has waived this argument. *See Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("[A] party does not waive an argument based on what appears in its pleading; a party waives arguments based on what appears in its brief.").

Suffice it to say, the Court finds no dispute of material fact on the question of whether Redstick's claim was validly assigned, or whether its otherwise prohibited assignment was waived by the government.  When pressed, Plaintiff, instead, merely reiterates its earlier allegations, *see, e.g.*, Pl.'s Resp. & Reply ¶ 113; however, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (internal quotation marks omitted).  Plaintiff has shown no genuine issue for trial.  Accordingly, the government is entitled to summary judgment on Plaintiff's HVAC claim.

## CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff has failed to establish that it is entitled to summary judgment on any of its alleged grounds.  Accordingly, the Court **DENIES** in its entirety Plaintiff's motion for partial summary judgment.  Furthermore, the Court concludes that there remains no dispute of material fact as to any of Plaintiff's claims on which the government seeks summary judgment.  Accordingly, the Court **GRANTS** the government's cross-motion for summary judgment.  The Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge